FOSTER *et al. v.* BALLENBERG *et al.*

(*Circuit Court, S. D. Ohio, W. D.* October 29, 1890.)

INJUNCTION—WHEN GRANTED.

A preliminary injunction will not be granted to compel the lessees of an opera-house to allow the complainants to use the house in accordance with a contract therefor, where such injunction would compel the lessees to break a similar con-tract made by them with an innocent third party, and the complainants cannot use the house with profit to themselves.

In Equity. On motion for preliminary injunction.
*Ramsey, Maxwell & Ramsey,* for complainants.
*Rankin D. Jones,* for defendants.

SAGE, J., (*orally.*) The bill was filed yesterday, and a motion for a preliminary injunction argued. The complainants aver that on the 25th day of August, 1890, they entered into a contract in writing with the defendant Louis Ballenberg, who signed it by the hand of Paul F. Nich-olson, agent, and who, although contracting in his own name, was act-ing for himself and his co-defendant, Powell Crosley, whereby it was agreed that the complainants, being proprietors and managers of an op-era company known as the "Boston Ideal Opera Company," should, on November 3, 1890, begin the rendition of the opera of "Fauvette" in the hall of the opera-house in Cincinnati known as "Pike's Opera-House," of which the defendants Crosley and Ballenberg were in possession as lessees or otherwise, having full control thereof, and power to let the same for the purposes contemplated by the said contract. The bill avers that by the terms of the contract said performances should begin on the 3d day of November, 1890, and continue until Saturday, November 8, inclusive; there being one performance each day, and one matinee. After setting forth the details of the contract, which provided, among other things, that the complainants should receive 70 per centum and the defendants 30 per centum of the gross proceeds of said performances, the complainants aver that said opera-house has not for several years been used as an opera-house or theater, that it was being remodeled and refitted, and that it was to be reopened as an opera-house on the date aforesaid of said first performance, and that it was stipulated in the contract that the rendition of the opera of "Fauvette" by the complain-ants, with their company, should be the first performance to be given

in said opera-house upon its reopening. It is further averred that an important advantage attaches to the company enjoying the privilege of opening a new house, for the reason that public attention is much attracted to an event of that character, and the houses are better filled upon such occasions than at other times; and that, in view of this advantage, the complainants consented to a smaller proportion of the gross proceeds than they otherwise would have been willing to accept. It is further averred that, notwithstanding the premises, the defendants have announced their purpose to break the said engagement, and have already advertised a performance to be given by another company, beginning on the 3d of November, and to continue throughout that week, and that defendants now refuse to allow the complainants to perform their said contract, and have so notified complainants, and threaten to exclude them and their company from said opera-house at the dates named. It is further averred that the Boston Ideal Company enjoys a high reputation, and that the refusal of the defendants to allow the said performance will be an irreparable injury to the complainants and to said company. The prayer of the bill is that the defendants may be enjoined from permitting the use of said opera-house during the period aforesaid by any other person or persons, and from permitting any other performance to be given therein, and that they be enjoined from refusing to allow complainants to give said performance of said opera, in pursuance of the terms of said contract, and that they be required to do and perform all things required of them under said agreement, as therein set forth. As an alternative prayer, the complainants pray that, if the court shall be of opinion that it is not able, according to the course of equity proceedings, to order the defendants to comply specifically with the details of said contract, the court shall order that the complainants may take possession of the opera-house, and furnish all things which, under said contract, the defendants were to furnish, and that upon final hearing the court shall decree that the defendants shall pay the expenses thereof, and for all other necessary and proper relief.

I have given to the examination of this case such care and attention as has been possible in the short time afforded me. It appears from the affidavits upon file that the defendant Ballenberg was, at the date of the contract set forth in the bill, in the employ of the defendant Crosley, but that he had no interest whatever in the lease of the opera-house. It appears from the affidavits of Ballenberg and of Crosley that Ballenberg had in fact no authority to make contracts for the services of theatrical or operatic troupes. He was authorized to receive propositions, and communicate them to Crosley; but no contract was to be made without the express approval of Crosley. It is not claimed that the contract in this case was so approved, and it is claimed that it must fall, so far as Mr. Crosley is concerned, because not within the authority conferred upon Ballenberg. Upon this point, it seems to me that the manager of a theater or opera-house occupies the position of a general agent, and therefore that a special limitation of his authority not communicated to or known by the manager of a troupe with which he in fact makes a contract in the

name and on behalf of his principal, or as manager, would not render the contract invalid, it being within the general scope of his authority as manager. But the contract in this case, which is attached to the affidavit of the complainant Foster, is, in terms, with Louis Ballenberg individually. Moreover, the bill makes Ballenberg a defendant as a principal, in joint possession of the opera-house with Crosley, as co-lessee, or otherwise. It is signed, "Louis Ballenberg, per Paul F. Nicholson, Agent." It appears affirmatively by the affidavit of Crosley that he never consented to or recognized the contract, nor did he even know of it until after the controversy upon which this litigation is founded arose. Now, while it is true that an undisclosed principal may be held to the performance of a contract made by his agent in his own name, I am strongly inclined to the opinion that that can only be done by showing that the execution of the contract was within the actual authority of the agent, inasmuch as in such case the contract was made with the agent as principal, and must be presumed to have been made relying on him alone, and not upon the authority implied from the scope of a general agency.

But I am not disposed to put the decision of this case upon that ground, nor am I disposed to enter upon the consideration of the controverted questions of fact respecting the condition of the Boston Ideal Opera Company, and its qualifications to render the opera in style requisite for successful performances. It is claimed on behalf of the defendants that, by reason of a change of conductors, and the retirement from the troupe of certain leading singers and of members of the chorus, the troupe was so weakened as not to be in condition to give performances that would draw paying houses. It is true that it is not claimed that these deficiencies are anything more than temporary, but it is insisted that they are of so recent date that the troupe could not be restored to its own proper standard in time for these performances. On the other hand, it is insisted that the defendants are bound by the contract to accept the services of the troupe, even if the complaints made were well founded in fact, which they deny. I do not agree to this proposition. I think such a contract calls for a full troupe, up to its ordinary standard, just as the contract for the services of a physician is a contract for the exercise, not only of the ordinary skill of the profession, but of the skill which he possesses, although he may be far above the average. But if the contract is for the services of a troupe, it cannot be avoided by averring that the performances of the troupe are not up to the standard of excellence recognized as necessary at the theater where the services were to be rendered. The person engaging the troupe is bound, in the absence of misrepresentation or fraud, to accept its performances if they are up to its own standard. The affidavits as to the condition of the complainants' troupe are conflicting. It is denied on their behalf that any changes have been made excepting for the better, and it is claimed that, as to the conductor, the leading singers, and the chorus, the troupe is as good as it ever has been, if not better. I shall not undertake to settle the dispute upon this feature of the case. It seems to me that other considerations, to which I shall now advert, are decisive.

It appears as an undisputed fact that the defendant Crosley has engaged another troupe for the time covered by the contract under which the complainants make their claim. It is not pretended that that other troupe has had any knowledge or notice of the facts of this controversy. They are advertised, and their bills are posted throughout the city. The theater is to be opened five days from this time. It appears, also, from the affidavits submitted on behalf of the defendants, that no scenery has been prepared suitable for the operas which the complainants desire to produce, and that it cannot be prepared in time for performances next week. The complainants are asking the court to compel the defendants to break off this last engagement, and inflict the same kind of injury upon the other troupe that they complain of in their own case. It seems to me that the result would be almost necessarily disastrous to all parties. The theatrical troupe would be thrown out of a week's engagement too late to make any other engagement, and the complainants would be without the time necessary to so advertise their performances as to secure paying audiences; and inasmuch as by the terms of their contract they are to pay their own expenses, which it is stated are $3,000 per week, it is at least doubtful whether they would not lose money, instead of profiting, by their engagement. The granting of a temporary injunction is within the discretion of the court. It has been held that where it will do the complainants little good and the defendants much harm it will not be granted, and where it will injure the defendants more than it will benefit the complainants it will not be granted. I am satisfied that this is a case which falls within these rulings, and I therefore overrule the motion for a preliminary injunction.

I suppose that this practically disposes of the case, and that the bill might as well be dismissed; but, as counsel for the complainants is not present, I will not now make an order to that effect.