## JAMES L. KERNAN COMPANY *v.* WILSON AMUSEMENT COMPANY.

[Nos. 39, 40, October Term, 1930.]

*Decided December 5th, 1930.*

8

The causes were argued before BOND, C. J., PATTISON, URNER, ADKINS, DIGGES, PARKE, and SLOAN, JJ.

*Frank B. Ober* and *William A. Grimes,* with whom were *Willard S. McKay, Daniel C. Joseph, Abram C. Joseph,* and *Janney, Ober, Slingluff & Williams,* on the brief, for the appellant.

*Myer Rosenbush,* with whom were *Rosenbush & Bernstein* on the brief, for the appellee.

BOND, C. J., delivered the opinion of the Court.

In the first of these cases, a licensee of the right to exhibit a copyrighted moving picture appeals from a preliminary injunction against the exhibition, issued at the instance of the owner of another theatre claiming an exclusive right or option to exhibit under an earlier contract with the distributor of the picture, under the authority of the producer and owner of the copyright. The second appeal is from an order refusing a petition of the defendant to cancel a bond previously required of it as a condition to the superseding of the injunction. The injunction was issued upon the bill of complaint and exhibits.

The complainant's contract, made on September 23rd, 1929, for the ensuing theatrical season, is on a printed form, with a special typewritten section added, and contains the following relevant stipulation: Thirty projected pictures, fifteen of which the exhibitor may reject, are specified as the first subject of the contract. Twelve are specified by the names of the plays, and eighteen by the names of the prin-

cipal performers, or stars, five of the eighteen by the names of two stars combined in their production, and thirteen by the names of single stars. The list contains: "2 La Plantes"; "2 John Boles"; and, on the other hand, "3 Tryon-Kennedy" and "2 Lewis-Kent." There is in the contract a reservation to the distributor or owner of a right to withdraw any two plays from the contract and license, to be exhibited as what are called "road shows." But except for that reservation, the complainant is given, in any of the plays which it might accept, the exclusive right arising from an agreement of the owner or distributor "not to exhibit or license the exhibition of any such photoplays in conflict with the 'run' or 'protection period,'" provided for. The special typewritten section provides the rates of compensation or royalties, all of which are percentages of receipts of the theatre from exhibition; and the percentages differ with three groups of the listed pictures. For a picture named "Broadway," the distributor is to receive "35 per cent. of gross to the time the house breaks even, exhibitor then to receive a profit equivalent to one-half the film rental to that point and then distributor and exhibitor to share fifty-fifty"; and this is coupled with a stipulation that if gross receipts in the first three days of exhibition amount to $4,500, there shall be a second week's showing of the picture at the same theatre, for which the distributor is to receive "20 per cent. to 5,000, 25 per cent. from 5,000 to 7,500, and 50/50 over 7,500." For the next six of the named plays on the list, grouped as Laemmle Specials, the distributor is to receive "25 per cent. to 9,000 and then to share 50/50 in excess of that amount." And for any of the remaining twenty-three pictures, called the Star Series, the distributor is to receive "20 per cent. to 4,000, 25 per cent. from 4,000 to 6,500, 30 per cent. from 6,500 to 9,000, and then to share 50/50 in excess of that amount."

After having specified these rates, the typewritten section concludes with these clauses:

"Exhibitor is to select or reject pictures within seven weeks after screening.

"Exhibitor is to have option on any additional pictures that Universal schedule to release during the 1929-30 season.

"All pictures listed hereon are to be exhibited on a six day engagement."

The clauses respecting "road shows," in the printed form, reserve to the distributor the right to exhibit or cause to be exhibited as road shows, at any time prior to exhibition under the contract, such of the photoplays licensed under the contract (not exceeding two in Baltimore City) as the distributor might from time to time select and determine. And the photoplays so "roadshown" are forthwith excepted and excluded from the license under the contract; and for each play so excluded the exhibitor, on its side, is to have an option to except and exclude one of the licensed plays from its contract.

While the contract so outlined was in existence, the distributor made a contract with the defendant, now appellant, giving it a license to produce at the Auditorium Treatre in Baltimore, beginning on April 4th, 1930, a play named "The Captain of the Guard," in which John Boles and Laura La Plante were the stars. The complainant, seeing the advertisement of the production, protested to the distributor, and the distributor replied that the license to the Auditorium Theatre had been granted only after the play had been rejected by the complainant itself. The complainant denied that it had rejected the play. And upon the facts so far recited, appearing in the bill of complaint and exhibits, filed on the day fixed for production of the play at the Auditorium Theatre,—and, it is to be presumed, after the defendant had made preparations and commitments—the court, on the same day, issued the preliminary injunction now attacked. Later on the same day the defendant filed its answer and demurrer, and entered an appeal from the order for the issue of the injunction. The bond for superseding the injunction was then fixed, and was given, and the injunction was superseded. On May 6th, 1930, the defendant, now appellant,

filed a petition praying that its supersedeas bond might be cancelled because the injunction had been issued upon contentions since abandoned by the complainant. It is from an order denying this petition that the second appeal is taken.

The bill of complaint proceeded upon the assumption that as John Boles appeared as a star in "The Captain of the Guard," the play came within the specification of "2 John Boles" pictures. The defendant and appellant argues that as Laura La Plante also appeared as a star in it, the play can be no more construed as one of the two John Boles pictures than it can as one of the two La Plantes specified in the contract list, and that, upon the true construction, it could not be classed as either, but only as a play of a combination of stars not specified in the contract list at all, and coming within the contract only under the clause for an option for additional pictures which might be released by the distributor during the season. This court is of opinion that the defendant's contention is correct. The separate listing of plays of Laura La Plante and plays of John Boles seems to contemplate only plays in which they appear separately, and the fact that plays of other combinations of stars are listed in the names of both—Tryon-Kennedy and Lewis-Kent —seems to confirm the conclusion that the specification of John Boles' plays was not intended to include one of both Boles and La Plante. The point need not be labored, for the complainant itself, in later cases before the court, classes "The Captain of the Guard" as one of the additional plays on which it was given an option. And taking the play to be such an additional one, several objections are urged to the issue of the injunction. We consider only two of them, either of which, as this court finds, should have prevented the action.

Passing any question whether rights which the complainant has under its contract with the distributor might be thus enforced against a subsequent licensee with notice, it is not charged here that when the later licensee, the defendant, made its contract, it had any notice of the earlier license or

option. The situation is that one licensee, or owner of an option, has been given an injunction restraining a second, innocent, licensee from proceeding with a contract made by it in good faith. The complainant has no contract with the defendant. It seeks merely the enforcement of an equity which it contends arises from priority of its license or option; and the equity is one which must depend upon the defendant's having been bound in conscience to avoid the conflict. But unless the defendant had notice of the prior right or claim when making its own contract, no question of conscience exists, and the defendant is under no obligation of conscience to give way. And no notice being charged there is, so far as appears from the bill and exhibits, no equity to be enforced. 2 *Pomeroy, Equity Jurisprudence,* secs. 739, 740, and 743; *Foster v. Ballenberg,* 43 Fed. 821; *Price v. McDonald,* 1 Md. 403, 414; *Engler v. Garrett,* 100 Md. 387, 398; *Liggett v. Rose,* 152 Md. 146, 159; *Gates Iron Works v. Fraser,* 153 U. S. 332, 349. In argument it was urged that enjoining the defendant may be permitted as the only means, indirect though it is, that the complainant has of reaching the distributor, a nonresident, and so enforcing the complainant's contract; but there is no reason why the innocent defendant should be made to suffer to afford the complainant this indirect remedy.

Again, the parties appear to have left the terms of payment for additional plays undetermined, with the result that the earlier contract for this one would remain to be made before any equities under it might be enforced. No prices or percentages, and no basis for ascertaining them, have been settled in the contract exhibited. The terms specified for the listed plays differ with one play and another, or with different groups of plays, and they differ without reference to any general scales or bases of ascertainment. For the play "Broadway," for instance, elaborate, detailed, terms, peculiar to that one play, were fixed. And the bill of complaint and exhibits describe "The Captain of the Guard" as a play of extraordinary value and success, with a cast of 5,000 players.

References in the terms for the listed plays to numbers of patrons seem to indicate a basis of computation that may vary with the capacities of different theatres. And there is no apparent ground for taking the terms here given to the Auditorium Theatre to be the terms which would or ought to have been required of the Rivoli Theatre. There is apparently no market price or reasonable price to be considered as just compensation for a copyrighted play. And we take the meaning of the clause on additional plays to be merely that the complainant shall have an option to exhibit in its theatre any such play as the producer might put out, at the price the producer may fix for its exhibition. And such an option this court has in several cases held to be too vague and uncertain to be enforced. *Delashmutt v. Thomas,* 45 Md. 140, 142; *Gelston v. Sigmund,* 27 Md. 334, 343. The court could not force an agreement on terms, and could not provide terms from any other source, and therefore it could not find the first essential to the issue of the injunction, viz: that the complainant has contract rights with which the later contract conflicts. *Hopkins v. Roberts,* 54 Md. 312, 317; *Bellevue Club v. Punte,* 148 Md. 589, 598; *Brown v. Summerfield,* 153 Md. 356; 4 *Pomeroy, Equity Jurisprudence,* secs. 1341 and 1405.

For these reasons this court has concluded that the injunction should not have been issued, and that on appeal the order for its issue must be reversed.

The decision on the issue of the injunction disposes of all questions on the correctness of the order on the supersedeas bond. The bond should not have been required, and the order must be reversed. As there would be no occasion for proceedings beyond this stage of the case, the bill may be dismissed.

> *Order appealed from in number 39 reversed, and bill of complaint dismissed, with costs to the appellant. Order appealed from in number 40 reversed, with costs to the appellant.*