DADE ENTERPRISES, INC., v. WOMETCO THEATRES, INC., a Delaware Corporation.

160 So. 209.
Opinion Filed March 7, 1935.
Rehearing Denied April 5, 1935.

*Herbert S. Sawyer, W. O. Mehrtens and Evans, Mershon & Sawyer,* for Appellants.

*Henry D. Williams* and *Albert B. Bernstein,* for Appellee.

DAVIS, J.—This was a suit for an injunction wherein the allegations of the bill of complaint were to the effect that a certain motion picture described as "the House of Rothchild" was of peculiar value to complainant and could not be duplicated; that complainant had caused to be advertised to the public that said motion picture would be exhibited at its theatres on certain specified dates; that in the course of so advertising the picture, complainant had spent various sums of money to announce to the public that said picture would play at a certain theatre of plaintiff in the Miami area on a certain date; that notwithstanding certain contractual rights which complainant had acquired in, and was entitled to enjoy concerning, the exhibition of

said moving picture at its theater, pursuant to a contract it had entered into involving same and giving the plaintiff the prior right to first exhibit said moving picture at its theatres, that defendant, Dade Enterprises, Inc., had knowingly undertaken to enter into a conflicting contract with reference to the identical moving picture, giving to it the right to exhibit said moving picture at an earlier date in advance of the date contracted for by complainant and advertised by it for such exhibition at its own theaters; that such conduct on defendant's part operated to deprive complainant of the special and peculiar value inherent in its contractural right to a first run exhibition of the particular picture in complainant's theaters, because of the fact that the picture in controversy was of such unique character and public interest as to be incapable of being duplicated; that United Artists Corporation, the perpetrator of the contractual violation against complainant's rights, maintained no office or agent in the State of Florida and that therefore complainant, in order to be saved irreparable injury, should have an injunction against the defendant, Dade Enterprises, Inc., to restrain it from exhibiting said moving picture "The House of Rothchild" in violation of complainant's prior right to exhibit such moving picture in the same territory, as secured by the contract upon which complainant relied, which it was averred defendant well knew at the time it also undertook to contract with United Artists for exhibition of the same picture but for a date prior to that already confirmed to complainant.

The Chancellor granted a temporary injunction, which was superseded by an order entered by a Justice of this Court, and defendant appealed.

Complainant's bill was framed on the theory that by reason of its alleged contract right securing to it the privilege

of a "first run" exhibition in the Miami area of the moving picture in controversy, it was entitled to injunctive relief against the defendant, Dade Enterprises, Inc., in order to stop the defendant from lending its aid and assistance toward the violation of complainant's contract covering the same subject matter, notwithstanding there was admittedly no contractual or other privity of relationship between complainant, Wometco Theatres, Inc., and the defendant, Dade Enterprises, Inc.

The weight of modern authority holds that interference with any contract amounts to a tort. That rule has been consistently adhered to in this State since the decision of this Court in Chipley v. Atkinson, 23 Fla. 206, 1 Sou. Rep. 934, 11 Am. St. Rep. 367. In such cases the injured party has an action against the party in default upon the contract, but he is not limited thereto. He may also maintain an action against the wrongdoer who induced such breach. 4 Page on Contracts, Section 2426, page 4298.

If one maliciously interferes with a contract between two persons, and induces one of them to breach the contract to the injury of the other, the injured party may maintain an action against the wrongdoer, and where the act was intentional, malice will be inferred. To do intentionally that which is calculated in the ordinary course of events to damage and which, in fact, does damage another person in his property or trade, is malicious in the law, and is actionable if it is done without just cause or excuse. Carmen v. Fox Film Corp. 258 Fed. 703; E. L. Husting Co. v. Coca-Cola Co., 205 Wis. 356, 237 N. W. Rep. 85.

And upon a like principle, it has been held that when owing to special features, a contract involves peculiar convenience or advantage, or where the loss occasioned by its breach would be a matter of uncertainty, so that the breach

of such contract might be deemed to cause irreparable injury and subject to equitable enforcement, the threatened or impending tort of a third party who interfered with the performance of such contract, or consciously contributes to the impairment of the right of a party thereto to avail himself of its obligations, may be enjoined by the party whose enjoyment of existing contractual rights is thus endangered, the application of this doctrine being no longer restricted to contracts for personal services. Alcazar Amusement Co. v. Mudd & Colley Amusement Co., 204 Ala. 509, 86 Sou. Rep. 209; Montgomery Enterprises v. Empire Theater Co., 204 Ala. 566, 86 Sou. Rep. 880, 19 A. L. R. 987; Standard Fashion Co. v. Siegel-Cooper Co., 52 N. Y. S. 433, 30 App. Div. 564; New York Phonograph Co. v. Jones, 123 Fed. 197; Turner v. Hampton, 30 Ky. L. 179, 97 S. W. Rep. 761.

In such cases a party may be enjoined against his own tortious act even if other parties interested with him are within the jurisdiction and not joined. In such a suit to enjoin an unlawful act of tortious interference with the performance of a contract the breach of which will occasion irreparable injury to one entitled to avail himself of such contract's obligations, it is not necessary to enjoin all the tort feasors as defendants where there are more than one, since a person receiving injury from the tortious acts of others has a remedy against one or all of the tort feasors and may enforce that remedy against one or all at his election, either at law or in equity. Deil-Overland Co. v. Willys-Overland, Inc., 263 Fed. 171; Freidberg v. McClary, 173 Ky. 579, 191 S. W. Rep. 300, L. R. A. 1917-C 777; Cole Silver Mining Co. v. Virginia & Gold Hill Water Co., 1 Sawy. 470, 6 Fed. Cases No. 2989.

So the theory of complainant's bill for injunctive relief as

filed in the Court below was sound, and equitable relief was properly granted thereon if such bill, or the cause for equitable relief set forth therein, was not otherwise insufficient to support an injunction.

The appeal in the case now before us is solely from the interlocutory order granting complainant below a temporary injunction after a motion to dismiss the complainant's bill for want of equity had been overruled, and after the defendant below had filed its answer denying the equity of the bill and had proceeded to a hearing on the injunctive application which was decided in the affirmative after a hearing of testimony, affidavits and documentary evidence submitted by the respective parties.

Upon an application for injunctive relief, or upon motion to dissolve the same, either party thereto shall have the right to introduce evidence, and the Chancellor shall grant, dissolve or continue the injunction applied for, according to the weight of the evidence. Section 4970 C. G. L., 3178 R. G. S. Where the defendant to a bill for injunction files an answer at the hearing of the application that is fully responsive to the bill and that denies all the equities thereof, the general rule is that the judge in granting or withholding the injunction must be governed by the weight and legal effect of the evidence. Campbell v. White, 39 Fla. 745, 23 Sou. 555.

The facts of the present case as disclosed at the hearing, were substantially as follows:

On October 26, 1933, United Artists Corporation, a distributor, entered into a contract of license with Sparks East Coast Theaters, an exhibitor, for the exhibition of a certain motion picture will become available to the distributor for Section 6 of that contract of license entitled "Fixing Exhibition Dates" was worded as follows:

"Sixth. The exhibition date or dates of such motion picture, unless definitely specified or otherwise provided for in the schedule, or otherwise agreed upon shall be as follows:

"(1) A road show is not a general release and the said motion picture will become available to the Distributor for distribution only upon the completion of any such road show. Any 'two a day' exhibition, exclusive of extra shows, at advanced admission prices for one or more weeks prior to release for general distribution of said motion picture shall be deemed an exhibition thereof as a road show. Should the motion picture be "road shown" in the immediate vicinity of the exhibiting theatre, in the same zone, as that word is understood in motion picture parlance, this contract for the exhibition of said picture may, at the option of either party, be cancelled by written notice given to the other party within 15 days after the commencement date of such road show.

"(2) Upon delivery by the producer, the distributor shall make the motion picture available to the exhibitor for exhibition within the twelve month period immediately following the August 1st next succeeding the acceptance of the application by the distributor, and provided the exhibitor is not in default hereunder the distributor shall mail to the exhibitor a notice in writing of the date when such motion picture will be available for exhibition by the exhibitor, such date being hereinafter referred to as the available date. Such notice shall be mailed to the exhibitor at least fifteen days before the available date therein specified.

"(3) The exhibitor shall within fourteen days after the mailing of such notice select the exhibition date or dates, such dates to be within the period commencing with the available date and ending thirty days thereafter, by giving

to the distributor written notice of the date or dates so selected. If the exhibition date or dates so selected by the exhibitor are not open for the exhibitor because such date or dates have been previously assigned to another or other exhibitors then the exhibition date or dates shall be determined as provided in the following paragraphs * * *

"(5) The date or dates fixed or determined as in this Article provided shall be for all purposes the exhibition date or dates of such motion picture as those set forth in the schedule before execution hereof by the exhibitor."

Section 9 of that contract entitled, "Assignment Upon Sale of Theatre," was worded as follows:

"*Ninth.* This license shall not be assigned by either party without the written consent of the other, provided, that if the exhibitor sells the said theatre or transfers any interest therein and is not in default hereunder, or under any contract with the distributor, the exhibitor may assign this license to the purchaser of the theater or of such interest without the written consent of the distributor but any such assignment shall not be valid or of any effect hereunder unless a written acceptance thereof by the assignee assuming the obligation of the exhibitor shall be delivered to the distributor. Any such assignment shall not release the exhibitor from liability hereunder unless such release from liability is consented to by the distributor in writing."

Thereafter, about January 10, 1934, Sparks East Coast Theaters executed a purported contract of sub-license with Wometco Theatres, Inc., the appellee, whereby six first run and six second run motion pictures were to be exhibited by Wometco Theatres, Inc. The purported contract was written in the form of a letter addressed to Wometco Theatres, Inc., and at the bottom these words, "Accepted: Wometco Theatres, Inc., by_____. Sparks East Coast Thea-

tres by ____ ____ Morrison." The capacity in which each signed was not shown on the agreement.

The material parts of the agreement so far as this controversy is concerned were:

"Wometco Theatre Inc., Miami, Fla.

"Gentlemen:

"We have a contract for the exhibition of six United Artists feature pictures for the season 1933-34, the announced titles of which are listed on a sheet hereto attached.

"With the consent of United Artists we hereby agree to sell you nine runs of these pictures for a consideration of $7,200.00. Payment of this amount to be made in the following manner: You are to make weekly remittances____ to Earnest Morrison, 203 Olympia Bldg., Miami, Fla._____ * * * .

"If for any reason United Artists does not release all of the pictures referred to within the twelve weeks referred to, then you are not to make payment for any picture or pictures not released within the twelve weeks period, but within fifteen days after release of said picture or pictures, you are to pay $1200.00 each. * * *

"With the consent of United Artists, you are to secure prints of pictures referred to direct from United Artists and not through us, but your payments nevertheless are to be made in accordance with terms hereinabove set forth. The intent of this clause is to enable you to date pictures referred to as best suits your requirements without any interference or lost .motion on our part. The announced titles are on a separate page and are initialed by you.

"You are to have nine runs, first to ninth inclusive, (white or colored) on these pictures in Greater Miami, Miami Beach and Coral Gables, and you are to have seven months from United Artists National release dates within

which to complete these runs. No other theatre in Greater Miami, Miami Beach or Coral Gables shall run these pictures until said periods of seven months shall have expired, provided your runs have not been completed within seven months. It is agreed that prints shall be made available to you for first run exhibition within ten days after National release dates of United Artists, or within ten days after United Artists make said prints available for us in Florida. * * *

"If United Artists should fail to release any picture or pictures referred to in attached list as being sold to you, you are released from payment for any such picture or pictures at the rate of $1200.00 per picture. Likewise no runs following our six runs will be due you on any picture or pictures not released by United Artists on the six pictures referred to herein as our pictures. Your acceptance of this proposal by a duly authorized official of your company will make its provisions binding upon you and ourselves forthwith until all of said provisions have been fully complied with by both parties hereto.

"Accepted:  "WOMETCO THEATRES, INC.

"By......................................................

"SPARKS EAST COAST THEATRES

"By----------------------------------------------"

This sheet was attached:

"United Artists 1933-34 Pictures to be played by Sparks

United Artists Pictures to be played by Wometco

| United Artists 1933-34 Pictures to be played by Sparks | United Artists Pictures to be played by Wometco |
|---|---|
| Moulin Rouge | Rothchild |
| The Bowery | Henry the Eighth |
| Sentenced | Gallant Lady |
| Monte Cristo | Broadway through a |
| Trouble Shooter | Keyhole |
| Born to be Bad | Lonely Hearts |
| Style | Blood Money" |

Five of these six first run pictures had been furnished Wometco Theatres, Inc., when this suit arose. The dates for exhibiting pictures were confirmed by United Artists to Sparks East Coast Theatres and they in turn confirmed dates to Wometco Theatres, Inc. But the films were sent direct from United Artists to Wometco Theatres, Inc., without passing through the hands of Sparks East Coast Theatres.

Prior to March 10, 1934, United Artists Corporation had confirmed the dates for the showing of "The House of Rothchild" to Sparks East Coast Theatres. The latter on March 10, 1934, wrote Wometco Theatres, Inc., a letter relative to the confirmation as follows:

"Wometco Theatres Inc.,
    "Miami, Florida.
"Gentlemen:
    "Attention Mr. Clements.
    "Have just received the following letter ·from United Artists:
    " 'In accordance with your request of February 23rd, we confirm *The House of Rothchild* as follows:

| | |
|---|---|
| "Mayfair Theatre, Miami | April 7-13 |
| "Plaza Theatre, Miami Beach | April 15-18 |
| "Capitol Theatre, Miami | April 22-29 |
| "Biltmore Theatre, Miami | April 29-30 |
| | May 1- 2 |
| "Grove Theatre | May 8- 9 |
| "Tower Theatre | May 13-16' " |

A stamp on the letter says it was received by Wometco, March 12, 1934, at nine o'clock, although testimony was given that it was received the tenth day of March. On

March 10, 1934, Mr. Eisman, the Atlanta Division Mana-
ger of United Artists, called on the officers of Wometco
Theatres, Inc., and discussed with them the withdrawal of
"The House of Rothchild" in order to run it as a road show
at another theatre for more money.

Four days later, March 14, 1934, United Artists wired
Sparks East Coast Theatres the following telegram:

"IN ACCORDANCE WITH CLAUSE ONE SIXTH PARAGRAPH
OUR CONTRACT ROTHCHILD WE ARE HEREBY RESCINDING
DATES PREVIOUSLY CONFIRMED TO YOU FOR MIAMI AND PALM
BEACH BOOKINGS STOP PLEASE NOTIFY THEATRES INVOLVED
AND WIRE YOUR UNDERSTANDING AND ACKNOWLEDGMENT
THIS TELEGRAM."

This was relayed by way of letter to Wometco Theatres
in letter dated March 14, 1934, and received by Wometco
Theatres March 15, 1934, at nine o'clock.

On March 14, 1934, United Artists entered into a con-
tract with Dade Enterprises, Inc., the appellant, to "road
show" the picture, "The House of Rothchild," for a seven
day run, beginning March 24, 1934. Wometco Theatres,
Inc., was apprised of the fact the same day the contract
was entered into.

At this juncture, appellee Wometco Theatres, Inc.,
brought its bill in equity to enjoin the road showing of the
picture, "The House of Rothchild," with the result herein-
before stated.

Its bill of complaint after alleging the facts already here-
inbefore stated, specifically averred as follows concerning
the irreparable nature of the injury with which it was
threatened:

"11. That the photoplays, sound pictures and talking
pictures produced, distributed and sold by said United Ar-
tists Corporation are known as United Artists Pictures

and are unique in themselves, have a peculiar value in themselves, and cannot be duplicated; that such pictures have been extensively advertised, and that the particular picture known as 'The House of Rothchild' has been announced to the public at the expenditure of much money, and through the unique service of George Arliss as the star of said picture, is one of the outstanding productions of the year; that said picture is in point of fact one of the finest and best which has been released during the current year, and has a unique, peculiar and special value in itself.

"12. That plaintiff, prior....March 15, 1934,....had expended considerable sums of money in announcing that it would exhibit said picture, and made said announcement publicly and extensively; attached hereto, marked exhibit H,....one of the many advertisements run by plaintiff in anticipation of a showing of said picture; that the moving picture business in Miami, Florida,....is to a great extent a seasonal business, and that the date for the exhibition of said picture was sought and obtained in particular reliance upon the ability of plaintiff to procure it as a first run picture at its leading houses during the month of April, at which time the tourist season in Miami is still in active operation; that if said defendant is allowed to exhibit said picture, as it proposes to do on March 24, 1934, for a run commencing on that date, plaintiff will suffer irreparable damage through the loss of moneys already expended for advertising, through the loss of patronage, and through the loss of prestige, in that it will have been unable to justify its presentation to the public that said picture, of the unique character and high quality that this picture possesses, was to be offered at its theatres and under its direction at the time specified in its said several announcements; that all of this is well known to defendant, as was the fact that plaintiff enjoyed contractual

rights for a first run of said picture in Miami, and said de-
fendant possessed such knowledge before it attempted to
negotiate with its licensor, the said United Artists Corpo-
ration, and such knowledge was further communicated to
defendant before defendant made any announcement of its
intention to exhibit said picture, and before said defendant
incurrred any expense in connection with such proposed
exhibition, but in spite of such knowledge the defendant
said, in utter disregard of plaintiff's rights, and with no
warrant of law by reason of its attempted license from said
United Artists Corporation, persists in its announcing, and
in its intention of exhibiting said picture at said State
Theater for a run commencing March 24, 1934; that not
only will plaintiff's rights have been violated if said picture
is shown by said defendant, but also any subsequent ex-
hibitions by plaintiff will have become minimized in value
and will be unfit for exhibition at first run or second run
motion picture houses; and that plaintiff's damage, both in
money and in prestige, is incapable of being adequately com-
pensated for in a court of law.

"13. That the said United Artists Corporation maintains
no office or agent in the State of Florida, and that to at-
tempt to serve it by publication for the purpose of obtain-
ing relief in this action against it, would render the entire
case moot, in that the time for the proposed exhibition by
said defendant would have passed before the court could
obtain jurisdiction of said United Artists Corporation."

It has been held that a moving picture exhibitor is not
entitled to an injunction restraining a subsequent innocent
licensee or contracting party from exhibiting a picture
within the terms of complainant's contract, where the suit
for injunction is brought only against the subsequent inno-
cent licensee, and the distributor under contract with the

complainant licensee has not been made a party, where no contractual relationship existed between first licensee, and subsequent licensee had no notice of the complainant's license. James L. Kernan Co. v. Wilson Amusement Co., 160 Md. 7, 152 Atl. Rep. 503.

In the present case the complainant below, Wometco Theatres, Inc., was a sub-licensee of Sparks East Coast Theatres which in turn was a licensee of United Artists Corporation with reference to the moving picture here in controversy. Dade Enterprises, Inc., was an independent licensee for "road show" purposes of the same picture under a license from United Artists Corporation. While it may have had notice of the fact that Wometco Theatres, Inc., was a sub-licensee of Sparks East Coast Theatres under the latter's license from United Artists Corporation for a "first run" after a general release, it was an innocent licensee insofar as "road showing" the picture is concerned, because the election of the United Artists Corporation to "road show" the picture as provided for in its contract in advance of general release, was stipulated in the contract and was acquiesced in by the principal licensee, Sparks East Coast Theaters, under which Wometco Theaters, Inc., must claim.

In a suit in equity brought solely against Dade Enterprises, Inc., to enjoin it as a tortious and willful intermeddler with the contractual rights of Wometco Theatres, Inc., it would be unreasonable and inequitable to hold that Dade Enterprises, Inc., could only act at its peril in accepting a "road show" contract from United Artists Corporation under circumstances wherein it appears that both these parties to the primary contract, neither of whom are parties to this suit, have construed the contract under which Wometco Theatres, Inc., is a mere sub-licensee, to give the

right to Dade Enterprises, Inc., to do the very act complained of and sought to be enjoined.

It is a rule of general application in injunction cases that an injunction should not be granted where there is substantial dispute as to the legal rights involved and the right of complainant is doubtful, or is not clear, or is questioned on every ground on which he puts it, not only by the answer of the defendant, but by the proofs in the cause. This is especially true in a case like the one now before us where a decision on the merits of the present controversy would necessarily affect valuable rights of the principal parties to the basic contract, neither of which parties is before the Court, but whose contract and the interpretation that it should have, is wholly determinative of whatever right complainant may be capable of asserting in the premises. See Roath v. Driscoll, 20 Conn. 533, 52 Am. Dec. 352; Rhea v. Forsyth, 37 Pa. St. 503, 78 Am. Dec. 441.

On the other hand, where the right for which equitable protection is prayed is reasonably clear and free from doubt the rule is different, and an injunction may issue to restrain a third party from doing complainant an irreparable injury through his tortious intermeddling with complainant's contract rights when the nature and character of the contract is of such nature that it can only be adequately safeguarded in equity under the circumstances shown upon the application for an injunction against its wanton circumvention by the wilful and unjustifiable intermeddling of one having knowledge of and bound to respect complainant's rights.

It follows that the order appealed from should be reversed and with directions to deny the injunction and dismiss the bill, without prejudice, however, to any right complainant may have to assert against United Artists Corpo-

ration or Sparks East Coast Theatres in appropriate proceedings in which they are made parties.

Reversed and remanded with directions.

WHITFIELD, C. J., and ELLIS, TERRELL, BROWN and BUFORD, J. J., concur.