432 So.2d 148 (1983)
TAMIAMI TRAIL TOURS, INC., a Florida Corporation, and D.D. Crosby, Appellants,
v.
J.C. COTTON and Aubrey Jesse Cotton, Appellees.
No. AN-109.
District Court of Appeal of Florida, First District.
May 9, 1983.
Rehearing Denied June 10, 1983.
*149 Albert M. Salem, Jr., of Salem, Musial & Morse, P.A., Tampa, for appellants.
Woodburn S. Wesley, Jr., of Cotton, Wesley & Poche, Shalimar, and Stanley Bruce Powell, of Powell, Powell & Powell, Niceville, for appellees.
WIGGINTON, Judge.
Tamiami Trail Tours, Inc. and D.D. Crosby appeal a jury verdict and final judgment finding them liable for tortious interference with a business relationship, and assault. We affirm as to all nine points raised by appellants. Only Points I and V merit our discussion.
J.C. Cotton (Cotton) and Aubrey Jesse Cotton (A.J. Cotton) filed their original two count complaint on June 22, 1977. A subsequent amended complaint was filed March 22, 1979, and differs from the original only in that Cotton enlarged upon the facts relating to Count I, which count alleged tortious interference and conspiracy to interfere tortiously with a business relationship of J.C. Cotton against Tamiami, Crosby, and William Stowe d/b/a City Cab Company of Fort Walton Beach, Florida.[1] Tamiami was joined in Count I on the basis of an alleged agency relationship between it and Crosby. Count II named only Crosby and was brought by A.J. Cotton alleging an assault and battery on him by Crosby.
The evidence presented at the two day trial of the case that commenced June 7, 1982, before an Okaloosa County jury, revealed the following: Tamiami was the owner and possessor of the Trailways Bus Station in Fort Walton Beach, Florida, which station was in the charge of Tamiami's agent, Crosby. In October, 1976, J.C. Cotton, with the help of his wife, son, and his life's savings of $8,000, purchased two cars and launched a taxicab business in Fort Walton Beach. Cotton testified that when *150 he approached Crosby at the bus station for permission to offer his cab service to the bus passengers, Crosby informed him that he had other friends in the cab business that he was "helping." According to Cotton, Crosby threw Cotton's card in the trash can and told him in no uncertain terms that none of his advertising was welcome on the premises.
Thereafter, Crosby began a smear campaign calculated to discourage prospective fares from using Cotton's cabs. As testified by Cotton, Crosby would say, "I wouldn't ride with that son of a bitch. He'll probably take you off and rob you." Cotton also testified that Crosby would lose or delay Cotton's fares' baggage, and would run his cabs off the premises shouting, "Get your ass off this bus station property." Meanwhile, City Cab, a local competitor, was allowed to remain.
Cotton began reporting Crosby's behavior to Tamiami's home office in Houston, Texas, in early January, 1977. The Houston office referred Cotton to Otis Sanders in Tallahassee, Florida, Crosby's immediate supervisor. In response to Cotton's persistent phone calls, Sanders promised several times to conduct an investigation, though none was ever made. However, a letter was dispatched from Sanders to Crosby advising that all taxicabs were to park in a designated area, easily visible to Tamiami's bus passengers.
Notwithstanding this somewhat tepid directive on Tamiami's part, Crosby persisted in his persecution of the Cottons, and even accelerated his destructive activities. Cotton found sand in the transmissions of his cabs, sugar in the gas tanks, and acid burns on the seats. A witness testified that, while jogging, he observed Crosby in the early morning hours throw under the cabs what appeared to be chicken feed, but what later turned out to be roofing tacks; Cotton began to average three or four flats a week. In addition, Crosby tore Cotton's advertisements from telephone books located in nearby pay booths. In an effort to avoid further conflict, Cotton rented adjoining property and installed a telephonic "hot line" between his lot and the station. Cotton witnesses Crosby cut the phone wires and learned that he had offered Cotton's landlord double or triple the rent to get him off the property.
On another front and in an effort to increase business, Cotton had established an arrangement with General Hospital to pick up cases of blood arriving by bus, at any hour, and deliver them to the hospital for $4 per trip. However, Crosby ordered Cotton to stop the deliveries and had his own employee deliver the blood at twice Cotton's delivery price. Angela Veal, a hospital representative, complained by telephone about the charge and was verbally abused by Crosby. When Mrs. Veal then personally confronted Crosby at the bus station, she was further subjected to vulgar vituperation. Mrs. Veal notified the Tallahassee office of the incident, but Tamiami took no action. As a result, the hospital ceased using Cotton's cabs to avoid further confrontation with Crosby.
As pertains to Count II, early in January, 1977, Crosby allegedly threatened to kill A.J. Cotton if he came near the bus station; and, shortly thereafter allegedly assaulted A.J. at the station. Cotton notified Sanders who replied, "We are getting a lot of complaints on that man. We are going to get an investigation out there and get it checked out"; no further action was taken. All of the foregoing took place prior to May, 1977.
As a result of these incidents, Cotton testified that his gross income from his cab business was reduced from approximately $3,000 in March, 1977, to $400 following June, 1977, when the action was instituted, and that his net income was at times reduced to zero.
At the close of plaintiffs' case, the trial court dismissed the paragraph of Count I alleging conspiracy. However, Tamiami's and Crosby's motions for directed verdicts as to liability under Count I for tortious interference were denied, as was Tamiami's motion for a directed verdict as to the assessment of punitive damages under that count. The court denied the motions on the *151 basis that there was sufficient evidence to present a question of fact for the jury.
Following the close of plaintiffs' case in regard to the assault and battery charges of Count II, the attorney representing both Crosby and Tamiami stated, "I move for a directed verdict on behalf of Crosby. I guess Tamiami was added to that too on the Count II, but there is no evidence to sustain that." The court denied the motion.
At the close of all of the evidence, Tamiami and Crosby renewed generally their motions for directed verdict and again the motions were denied. The jury returned its verdicts assessing compensatory and punitive damages under both counts. As to Count I, the jury awarded Cotton $27,000 compensatory damages against both Crosby and Tamiami as joint and several tort-feasors, and punitive damages in the amount of $10,000 as against Crosby, and $250,000 as against Tamiami.
Under Count II, the jury awarded A.J. Cotton $25 in compensatory damages, again against both Crosby and Tamiami, and punitive damages in the amount of $1,000 as against Crosby, and $50,000 as against Tamiami. Defense motions for new trial, judgment in accordance with motion for directed verdict, remittitur and to interview jurors were denied. This appeal followed.
Under Point I, appellants argue that Cotton failed to prove tortious interference with a business relationship. Specifically, it is appellants' contention that no showing was made of any effort on their part to secure a business advantage over Cotton, a position taken in reliance on a series of cases decided by the Third District Court of Appeal. See Hales v. Ashland Oil, Inc., 342 So.2d 984 (Fla. 3d DCA 1977), cert. denied, 359 So.2d 1214 (Fla. 1978); John B. Reid & Associates, Inc. v. Jimenez, 181 So.2d 575 (Fla. 3d DCA 1965); and see also Berenson v. World Jai-Alai, Inc., 374 So.2d 35 (Fla. 3d DCA 1979). In all due respect to our sister court, however, we decline to concur in that position.
Traditionally, for purposes of setting forth a prima facie case of tortious interference with a business relationship a plaintiff was required to establish four elements, those being (1) the existence of a business relationship not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with that relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship. See Smith v. Ocean State Bank, 335 So.2d 641 (Fla. 1st DCA 1976); Nichols v. MoAmCO Corporation, 311 So.2d 750 (Fla. 2d DCA 1975); Symon v. J. Rolfe Davis, Inc., 245 So.2d 278 (Fla. 4th DCA 1971); cert. denied, 249 So.2d 36 (Fla. 1971); Franklin v. Brown, 159 So.2d 893 (Fla. 1st DCA 1964); and Dade Enterprises v. Wometco Theatres, Inc., 119 Fla. 70, 160 So. 209 (1935). Other jurisdictions have established similar elements. See generally 45 Am.Jur.2d Interference § 50 (1969); 5 A.L.R. 4th 9, § 2 (1981) (liability for interference with at-will business relationship); and 9 A.L.R.2d 232, § 2 (1950) (liability of one who induces or causes a third person not to enter into or continue a business relation with another).
However, the Third District has broken down the "intentional and unjustified" interference element so as "to require that the interference by the defendant be to secure some sort of business advantage directly over the plaintiff." Berenson v. World Jai-Alai, Inc., 374 So.2d at 40. That requirement first appeared in John B. Reid & Associates, Inc. v. Jimenez, when the Third District interpreted Franklin v. Brown as requiring a showing "that in order to secure an advantage, the defendant, by fraud, induces plaintiff's business associate to act in a way which destroys plaintiff's business relationship." (Emphasis added). John B. Reid & Associates, Inc. v. Jimenez, 181 So.2d at 575. Although it would be logical to assume that the fraudulent activities conducted by the defendants in Franklin were motivated by the defendants' desire to secure a financial advantage for themselves, such motivation was not cited by this Court as necessarily included in the "intentional and unjustified" element of tortious interference in a business relationship. *152 Indeed, nowhere in Franklin does the phrase, "to secure an advantage," surface. Moreover, our subsequent decision in Smith v. Ocean State Bank thoroughly discussed the holdings of both Franklin and Reid & Associates, and reiterated the elements of the tort without speaking to the construction espoused by the Third District.[2]
The view adopted by the Third District has not appeared in the decisions of other of our sister courts, as evidenced by the Fourth District's decision in Frank Coulson, Inc.-Buick v. Trumbull, 328 So.2d 271 (Fla. 4th DCA 1976), involving the issue of the liability of a defendant who induced a third party, General Motors, to sever a business relationship with the plaintiff, Frank Coulson. Through allegedly false communications between the defendant and GM concerning poor service by the plaintiff, Coulson was "virtually drummed out of the corps" by GM. Without finding any purpose on the part of the defendant to secure a business advantage over the plaintiff, the court found that Coulson had made a prima facie case of interference. Interestingly, the Fourth District so concluded on the basis of Reid & Associates.
In short, we decline to construe so narrowly the "intentional and unjustified" element of tortious interference with an advantageous business relationship as to require interference instigated in order to secure a business advantage over the plaintiff. Rather, liability will depend not on a single definitive rule, but largely on factors and circumstances unique to each case. Thus, in the instant case, the evidence presented by Cotton overwhelmingly established the "intentional and unjustified" element, as well as the other three elements, to allow the question of tortious interference to be presented to the jury. The trial court did not err in denying appellants' motion for directed verdict.[3]
Turning to Point V, it is Tamiami's contention that the trial court erred in allowing A.J. Cotton to recover from it for the assault committed by Crosby when Tamiami was not named as a defendant. The record shows that the amended complaint and pretrial memoranda name Crosby, individually, and not Tamiami, under Count II. Nor were the pleadings specifically amended to name Tamiami as a party under Count II. However, the record also clearly reflects that Tamiami never once objected on the basis of its not being named under Count II, neither during trial when the evidence indicated the possibility of Tamiami's involvement under that count, nor at the charge conference where counsel and the court prepared and approved the jury instructions and special verdict forms and when the issue was directly presented *153 and ripe for objection. Nor do we find the inclusion of Tamiami as a party defendant in Count II to be prejudicial. Tamiami was at all times present during the trial, represented by counsel, and suffered no lack of notice. The defense utilized by Tamiami under Count I would be identical to that necessarily employed under Count II. Indeed, we recall and restate that certain remark made by counsel for Tamiami during the defense motions for directed verdicts at the close of plaintiffs' case, to-wit: "I move for a directed verdict on behalf of Mr. Crosby. I guess Tamiami was added to that too on the Count II ..." By that acknowledgment, and by otherwise never objecting on the basis that Tamiami was not named as a party to Count II and therefore would not be liable, Tamiami effectively joined itself, mid-trial, under that count. The evidence was sufficient to present the question of Tamiami's liability under Count II to the jury, and we decline to reverse the trial court on this point.
The final judgment is, in all respects, AFFIRMED.
ROBERT P. SMITH, Jr., C.J., and SHIVERS, J., concur.
NOTES
[1] Stowe was later discharged as a party following a directed verdict in his favor at the end of the plaintiffs' case.
[2] The problem was perpetuated by the next in the line of Third District decisions, Hales v. Ashland Oil, Inc. However, a reading of the Hales holding would indicate a focus not so much on the business motive of the defendant but on whether the plaintiffs suffered a direct, as opposed to an indirect, injury:

In each of the cases cited [by plaintiffs], the defendants sought to procure some sort of business advantage directly over the plaintiffs. Plaintiffs herein have at best been indirectly affected by the defendants' attempts to secure an advantage over Pickard. We have been unable to find a single case which has allowed recovery based on the kind of indirect harm which plaintiffs have allegedly sustained. 342 So.2d at 986.
Thus, the court held that the fraudulent breach of a contract with a boat builder, resulting in the unavailability of a particular boat to the builder's customers, was not a direct injury to the customers. 32 Fla.Jur.2d Interference § 5 (1981).
Finally, the Third District's decision in Berenson v. World Jai-Alai, Inc., put all doubt to rest by formally requiring the interference be by one attempting to secure a business advantage over the plaintiff. 374 So.2d at 40. Although the court cites first to Hales, it ultimately relies on International Funding Corp. v. Krasner, 360 So.2d 1156 (Fla. 3d DCA 1978). However, Krasner makes no similar statement, but affirms the dismissal of a counterclaim due solely to the failure of the counter-plaintiff specifically to aver the business relationships with which the counter-defendants had allegedly intentionally and unjustifiably interfered.
[3] As appellee has noted, appellants did not argue this point below. However, in answer to appellants' reply, the foregoing analysis is also for the purpose of demonstrating the lack of fundamental error.