**SUNBEAM CORPORATION,**
Appellant,
v.
**MASTERS OF MIAMI, Inc.,**
Appellee.
No. 15414.

United States Court of Appeals
Fifth Circuit.
July 22, 1955.

Douglas D. Batchelor, Miami, Fla., Herman T. Van Mell, Chicago, Ill., for appellant.

Louis M. Jepeway, John G. Dauber, Jepeway & Dauber, Miami, Fla., for appellee.

Before HUTCHESON, Chief Judge, and RIVES and TUTTLE, Circuit Judges.

TUTTLE, Circuit Judge.

The sole question here is whether the complaint states a claim for which relief can be granted. Jurisdiction is properly based on diversity of citizenship, and the applicable substantive law is that of the State of Florida. Sunbeam Corporation commenced this action, seeking an injunction and damages on the ground that Masters of Miami, the defendant below, wrongfully interfered with Fair Trade contracts between Sunbeam and the distributors and retailers of its products in states where such contracts are valid, by inducing them to sell to Masters of Miami the trademarked products of Sunbeam in violation of the Fair Trade contracts. For a second cause of action it was alleged that Masters of Miami, by buying and selling Sunbeam products without having entered a Fair Trade contract with Sunbeam, had unlawfully appropriated Sunbeam's trademarks; but since Sunbeam's brief on appeal does not make any ar-

gument relative to the dismissal of the second cause of action, under our Rules that matter may be disregarded. Rule 24.2(b). The court below having dismissed the complaint for failure to state a claim for which relief can be granted, Sunbeam appealed and asks that we determine whether "it appears to a certainty that the plaintiff cannot possibly be entitled to relief under any set of facts which could be proved in support of" the allegations under the first claim in the complaint. This being the test of sufficiency of a complaint, we must reverse the judgment if the complaint satisfies this test. John Walker & Sons v. Tampa Cigar Co., 5 Cir., 197 F.2d 72; Byrd v. Bates, 5 Cir., 220 F.2d 480.

The complaint alleges that Sunbeam Corporation has for more than thirty years been engaged in manufacturing and selling electrical and other appliances under the trade name "Sunbeam" and other trade names. At present its gross sales exceed $70 million a year and its annual advertising and promotional expenses exceed $3 million. Sunbeam's products are distributed through some 1,200 wholesalers throughout the United States, who supply over 175,000 retail dealers, several thousand of whom are in the State of Florida. In order to take advantage of the so-called Fair Trade Laws existing in 45 states, including Florida, Sunbeam has adopted and followed since 1951 a policy of selling its products in these 45 states only to distributors who contract (1) not to advertise or sell Sunbeam products at less than the minimum wholesale price established by Sunbeam, and (2) to require all persons to whom it sells Sunbeam products to enter into contracts whereby such persons will not, in turn, advertise or sell such products for less than the retail price established by Sunbeam. Through this policy of resale price maintenance, combined with the high quality of its merchandise and national advertising, it is alleged that Sunbeam's trade marks and brand name have acquired great value. Defendant Masters of Miami, Inc., has the same officers and stockholders as Masters, Inc., a New York corporation, which is engaged in Fair Trade litigation with Sunbeam in the State of New York, and by virtue of this fact and of specific notice given by Sunbeam, Masters of Miami, Inc., is well aware of Sunbeam's Fair Trade distribution policy. However, although it has not signed a retail contract with Sunbeam, it is engaged in advertising and selling at retail the products manufactured by Sunbeam at less than the prices specified in the Fair Trade contracts. Furthermore, it is alleged that Masters of Miami, Inc., has interfered with the contracts between Sunbeam and its wholesalers and retailers by purchasing Sunbeam products through channels and means unknown to Sunbeam, knowing that these wholesalers and retailers were not permitted to sell such products to a nonsigner. It is further alleged that in order to conceal their source, Masters of Miami, Inc., destroyed and defaced all shipping labels on Sunbeam products it had acquired in this manner.

The court below was of the opinion that no recovery could be had on this complaint because to allow any relief would be against the public policy of Florida, and furthermore because the complaint fails to set forth specific acts of interference.

We are of the opinion that the complaint was sufficiently *specific* under the test announced by us in the John Walker case, supra. Assuming that liability could be predicated on a specific state of facts falling within the general allegations of the complaint, Sunbeam should not be denied the opportunity to ascertain the specific facts through discovery proceedings and examining witnesses who know the facts, nor should a discount house be allowed to defeat a just claim by the simple expedient of defacing the shipping labels on its goods. The facts are peculiarly within the defendant's knowledge, and we do not think it is aggrieved by the failure of the plaintiff to allege them; the plaintiff would be entitled to employ discovery proceedings and to narrow down the

issues by an appropriate means provided in the Federal Rules. In short, assuming Sunbeam might be able to prove a right to relief under these general allegations, the lack of a specific allegation of the source and means employed by Masters of Miami is no ground to dismiss the complaint.

Thus, the only real question is whether the public policy of Florida permits such an action.

It is appropriate briefly to review the history of resale-price maintenance or "Fair Trade," as its supporters style it. The tide of battle over this controversial subject has ebbed and flowed. Condemned in the early cases [1] as a restraint of trade violating the Sherman Act,[2] the system received approbation in numerous state statutes during the depression of the 1930's, and in the case of Old Dearborn Distributing Co. v. Seagram-Distillers Corp., 1936, 299 U.S. 183, 57 S.Ct. 139, 81 L.Ed. 109, the Supreme Court held the Illinois Fair Trade law a valid exercise of state police power, not transgressing the due process and equal protection clauses of the Fourteenth Amendment. Congress one year later passed the Miller-Tydings amendment [3] in order to except Fair Trade contracts valid under state law from the ban of the Sherman Act. But the triumph of the Fair Trade faction was only apparent, for in 1951, in Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035, 19 A.L.R.2d 1119, the Supreme Court held that the Miller-Tydings Act validated state legislation only to the extent that it made Fair Trade contracts enforceable *inter partes,* and that the Sherman Act still precluded state legislation making the price-maintenance arrangement enforceable against nonsigners. But the tide shifted again when Congress saw fit to remove this and other federal statutory difficulties standing in the way of Fair Trade legislation by the states, in the McGuire Act [4] of 1952; and we held that statute constitutional in Schwegmann Bros. Giant Super Markets v. Eli Lilly & Co., 5 Cir., 205 F.2d 788, certiorari denied 346 U.S. 856, 74 S.Ct. 71, 98 L.Ed. 369. At the present time there seem no longer to be any federal constitutional or statutory barriers to Fair Trade legislation.

However, the state Fair Trade Acts—now numbering 45—have continued to suffer vicissitudes in the state courts, and in none have they fared worse than in Florida. In Bristol-Myers Co. v. Webb's Cut-Rate Drug Co., 137 Fla. 508, 188 So. 91, the nonsigner clause of the first Florida Fair Trade Act, Ch. 18395, Acts of 1937, was held unconstitutional as not within the scope of the Act's title. The legislature responded with another Fair Trade Act in 1939. This Act was held unconstitutional in Liquor Store, Inc., v. Continental Distilling Corporation, Fla., 40 So.2d 371, 388, on the ground that it exceeded the bounds of the legislature's police power; that is, the power to protect public health, welfare, and morals, because it served the private interest of one economic group to the detriment of the general public.[5]

1. E. g., Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502.

2. 15 U.S.C.A. §§ 1–7.

3. 50 Stat. 693, amending 15 U.S.C.A. § 1.

4. 66 Stat. 631, amending 15 U.S.C.A. § 45.

5. This case also involved a nonsigner. Three strongly worded separate majority opinions were written. Five of the six justices concurred in each of these, the sixth justice dissenting. In the opinion of Barns, J., an additional reason why the Act was unconstitutional was cited, namely that it offended the equal protection clauses of the federal and state constitutions, U.S.Const. Amend. 14; F.S.A.Const. Declaration of Rights, §§ 1, 12, by making an arbitrary and unreasonable distinction between "vertical" and "horizontal" price-fixing agreements. This was held in spite of the U. S. Supreme Court's contrary holding on the federal constitutional point in the Old Dearborn case, supra. The opinion of Hobson, J., inveighed strongly against the "selfish interests" supporting such legislation, quoting the words of Cicero against Cataline: " 'To what length wilt thou abuse my patience; to what extent

Later, the legislature passed a third Fair Trade Act, Ch. 25204, Acts of 1949. This Act was in all material respects like that of 1939 except that the legislature affixed a lengthy preamble styled "Findings of Fact" which declared that the Act would serve the public interest and was a lawful exercise of the police power. In Seagram-Distillers Corp. v. Ben Greene, Inc., Fla., 54 So.2d 235, the Supreme Court unanimously held that the nonsigner clause of this act was invalid, applying the rule of the first Schwegmann case, 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035, 19 A.L.R.2d 1119. After the McGuire Act removed that barrier, the question of constitutionality of the nonsigner clause of the 1949 Act came squarely before the court. In Miles Laboratories, Inc., v. Eckerd, Fla., 73 So.2d 680, 681,[6] the court held that the so-called "Findings of Fact" had not cured the defects in the earlier act, and held this act unconstitutional as applied to a nonsigner. The court's language is notably strong:

"This Court has expressed its views on fair trade and similar acts and has consistently and unequivocally rejected, on constitutional grounds, both the underlying theory and the economic facts on which they are sought to be predicated [citing eight cases]. * * *

"As we have stated before, the real effect of the non-signer clause is anti-competitive price fixing; not the protecting of the good will of trade marked products as other courts have held. Good will, it has been said, should be determined by the price which the goods can command in a competitive market, and not by the ability of the manufacturer to sell at a pegged retail price which he himself selects. * * * Except in times of economic emergency such inflexible price arrange-

ments which the act sanctions are not in line with our traditional concepts of free competition, which have traditionally been the 'yard stick' for protection of the consuming public. The real vice of the nonsigner clause is the absence of that standard, and the decisions of this Court cited herein so hold. In removing the said standard the nonsigner clause must fall as an invalid use of the police power for a private, not a public purpose. Liquor Store, Inc., v. Continental Distilling Corporation, supra."

The Florida Supreme Court seems to have been more consistently opposed to the Fair Trade Acts on public policy grounds than any other court; however, since Congress has let down the federal bars to such legislation, a growing minority of states have joined Florida in declaring such legislation unconstitutional. Many of the cases are so recent that they are now pending appeal. Union Carbide & Carbon Corp. v. White River Distributors, Ark., 275 S.W.2d 455; Olin Mathieson Chemical Corp. v. Francis, Colo.Dist.Ct., 1955 CCH Trade Cases ¶67,984; Grayson-Robinson Stores, Inc., v. Oneida, Ltd., 209 Ga. 613, 75 S.E.2d 161; Cox v. General Electric Co., 211 Ga. 270, 85 S.E.2d 514; Shakespeare Co. v. Lippman's Tool Shop Sporting Goods, 334 Mich. 109, 54 N.W.2d 268; McGraw Electric Co. v. Lewis & Smith Drug Co., Inc., 159 Neb. 703, 68 N.W.2d 608; General Electric Co. v. Thrifty Sales, Inc., Utah Dist.Ct., 1954 CCH Trade Cases ¶67,861.

Now, the appellant Sunbeam Corporation says that the Florida Supreme Court has retreated from its "consistent and unequivocal" opposition, on constitutional grounds, to the Fair Trade Acts, by denying certiorari without opinion in the recent case of Chase & Sherman v. Sunbeam Corp., Circ.Ct. Dade County,

wilt thy unbridled audacity affront itself?' " We note that among these five justices, four are still members of the Supreme Court and constitute a majority thereof.

6. Noted in 9 Miami L.Q. 234 and 4 Catholic U.L.Rev. 143.

CCH Trade Cases ¶67,524, certiorari denied, Fla., 73 So.2d 714. In that case the Circuit Court held that a Fair Trade resale-price maintenance contract could be enforced *inter partes*. But we are not convinced that this really marks a retreat, or that the Supreme Court would not have decided the question differently on the merits. For it seems to us that the constitutional theories repeated in so many of its decisions would be more consistent with declaring the entire Act invalid. And just as denial of certiorari by the United States Supreme Court carries no implication concerning the merits of the case, State of Maryland v. Baltimore Radio Show, 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562, we do not think we are required to regard the Circuit Court decision in the Chase & Sherman case as the law of Florida, in view of the Supreme Court's strong and consistent declarations that as a constitutional matter, the public policy of Florida is opposed to this scheme of price maintenance. We think it may well be that Fair Trade contracts are unenforceable in Florida even between the parties; however, it will be seen that this is unnecessary to our decision here, and we do not decide that question. For reasons stated infra, we think the Chase & Sherman decision does not have any important bearing on the issue we are called upon to decide.

The theory of the present complaint, that the defendant is guilty of the tort of inducing signers of resale-price maintenance contracts to breach the contracts by selling Fair Traded products to the defendant, is not a recent innovation. In fact, this was the basis of one of the earliest important cases, Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502. But recently the manufacturers of Fair Traded goods have turned to this theory more often as a result of the growing tendency of state courts to condemn attempts to prevent nonsigners from *selling* below list prices. They argue, as Sunbeam argues here, that entirely different public policies apply to attempts to prevent nonsigners from *buying* Fair Traded products. But in all frankness, we see little merit in the attempted distinction relative to policy. Preventing nonsigners from buying goods diminishes the scope of competition just as surely as preventing them from selling below list prices, though it is true that it is a more indirect way of accomplishing that object of the Fair Trade supporters. Nevertheless, some lower courts in states where nonsigner clauses have been struck down as unconstitutional, have accepted this argument and granted injunctions in cases precisely like the one before us. Argus Cameras, Inc. v. Hall of Distributors, Inc., Mich.Circ.Ct., 1954 CCH Trade Cases ¶67,916; Sunbeam Corporation v. Economy Distributing Co., Inc., D.C.E.D. Mich., 131 F.Supp. 791. And a Florida trial court very recently granted an injunction of *sales* at less than Fair Trade prices where it was proved that the nonsigning defendants had induced the breach of specific Fair Trade contracts. Union Underwear Co., Inc. v. Rayvis, Circ.Ct. Dade County, 1955 CCH Trade Cases ¶68,051. No appeal was taken in that case.

However, we think the decision in the Union Underwear suit was entirely contrary to the rule of public policy set out in case after case by the Florida Supreme Court. We do not find it necessary to decide that Fair Trade contracts are invalid in Florida even between the parties. Appellant's brief argues that we would have to base any affirmance in this case on such a holding, saying:

"There is no doubt but that interference with the performance of a lawful contract gives rise to an action against the person interfering with that contract, not only for damages, but also for injunctive relief."

We cannot agree with this bald statement. In the field of trade interference, the public interest in maintaining competition quite often may *privilege* such behavior. See Restatement, Torts, §§ 766–774. The principle we think determinative in the present case is expressed by the Restatement as follows:

"§ 774. Privilege to Break Restriction Violative of Public Policy.

"One is privileged by proper means to induce the non-performance of a contract or bargain, the purpose or effect of which is to restrict his business opportunities in violation of a defined public policy.

"*Comment:*

"a. The privilege stated in this Section enables a person to protect himself by proper means against restrictions on his business opportunities when the restrictions violate a defined public policy. In some cases such a restriction may be the avowed purpose of the interrupted arrangement; in others this may be the effect, in view of the administration of the arrangement or other circumstances, whether or not it is the purpose. It is not enough, however, that the contract or bargain involved restricts the actor's business opportunities. Every contract limits in some degree the opportunities of persons not parties to the contract. Such a restriction is ordinarily deemed desirable both in the public and the private interest. However, some restrictions may work prejudice to both interests. Accordingly, contracts in unreasonable restraint of trade are generally unenforceable even against the contracting party. The rule stated in this Section is not limited, however, to such contracts. *Though the contract may be enforceable in some manner between the parties, one whose business opportunities are restricted by it may be able to survive only through a breach of the restriction; and this breach he is privileged to seek by proper means, if the restriction vio-*

*lates public policy.*" (Emphasis added.)

The leading case applying the principle of the italicized language is Fairbanks, Morse & Co. v. Texas Electric Service Co., 5 Cir., 63 F.2d 702, where in an opinion by Judge Hutcheson this court held that the prospective builder of a municipal electric plant was justified in soliciting customers of a public utility which had long term contracts with 90 per cent of the users of electricity in every community which it served, to agree to make exclusive three-year contracts with the municipal plant, on grounds of public policy. It is clear that the contracts in that case were enforceable in some manner between the parties. See also Prosser, Torts, 982.

We think this principle is entirely right; in fact, it is a necessary corollary to the adoption of a public policy in such matters. To reverse the judgment in the present case would be to refuse to apply the public policy of Florida as it has most recently been declared by its Supreme Court, which said that it had "consistently and unequivocally rejected, on constitutional grounds, both the underlying theory and the economic facts on which [the Fair Trade Acts] are sought to be predicated." Miles Laboratories, Inc., v. Eckerd, supra [73 So.2d 681]. It is not for us to change the public policy of Florida, to refuse to apply it, or to find it has changed from such uncertain indications as the denial of certiorari or decisions of lower courts. We think we must affirm the judgment whether we agree with that public policy or not.[7]

We well realize that Fair Trade is a highly controversial subject among economists and businessmen as well as in the courts. With regard to the economic soundness of the arguments on either

7. A strong case could also be made for the proposition that where, as here, extraordinary relief in the nature of the equitable remedy of injunction is sought, the trial court had the duty to weigh the public policy implications with the other factors in determining whether such an action of the nature of a bill in equity would lie. Not every continuing breach of contract entitles the injured party to the intervention of a court of equity.

side, we note with interest that the Report of the Attorney General's National Committee to Study the Antitrust Laws, published March 31, 1955, is opposed to resale-price maintenance.[8] That Report appears to be a very careful study of the economic as well as the legal considerations, and its conclusions may well be influential in the courts as well as Congress. See also Cook, "The Continuing Fair Trade Battle," 29 St.Johns L.Rev. 66 (1954).

▆▆ Since we conclude that, whether or not Fair Trade contracts are enforceable between the parties thereto, the public policy established by the Florida Supreme Court is opposed to actions such as the present one, there is no conceivable way in which plaintiff could prove a right to recover on the allegations of this complaint. Whether the source of supply which Masters of Miami, Inc., enjoys is in Florida, New York (where the Fair Trade Act is valid even against non-signers), or the District of Columbia (which has no Fair Trade Act), no action can be brought in Florida. It is settled law that no foreign tort action contrary to a strong public policy of the forum state can be maintained. Restatement, Conflict of Laws § 612; 11 Am.Jur., "Conflict of Laws" § 183. The Full Faith and Credit clause does not require Florida courts to enforce such a foreign cause of action, if any there is. Cf. Hughes v. Fetter, 341 U.S. 609, 612, 71 S.Ct. 980, 95 L.Ed. 1212.

The judgment appealed from is Affirmed.

RIVES, Circuit Judge.

I dissent.

HUTCHESON, Chief Judge (concurring).

I agree with all that is said in the opinion about the public policy of Florida with respect to so-called fair trade contracts and the effect of that public policy upon this suit. I am of the opinion, however, that wholly apart from those considerations, the suit fails because nothing is alleged to have been done by defendant which under settled law the defendant did not have the absolute right to do. Simply stated, it is my view that the matter is ruled by the principle stated by us in Fairbanks, Morse & Co. v. Texas Electric Service Co., 5 Cir., 63 F.2d 702, at pages 705–706:

"* * * The whole doctrine of interference with the business and contracts of another springs from, its foundation rests in, public policy. The true balancing of public interests has always been the recognized

---

8. A few members of the Committee opposed outright repeal of the Miller-Tydings and McGuire amendments, but the majority of the Committee concluded as follows, Report, p. 154:

"On balance, we regard the Federal statutory exemption of 'Fair Trade' pricing as an unwarranted compromise of the basic tenets of National antitrust policy. We recognize that the legislatures of 45 states have at some time accorded official sanction to 'Fair Trade' pricing; that the Congress twice deferred to state enactments by creating federal 'Fair Trade' exemptions from antitrust prohibitions; and that without federal immunization 'Fair Trade' pricing, as a practical matter, cannot survive. Nevertheless, the throttling of price competition in the process of distribution that attends 'Fair Trade' pricing is, in our opinion, a deplorable yet inevitable concomitant of federal exemptive laws.

Moreover, whatever may be the underlying legislative intent, any operative 'Fair Trade' system facilitates horizontal price-fixing efforts on the manufacturing and each succeeding distributive level. And the prominent existence of a federal price-fixing exemption not only symbolizes a radical departure from National antitrust policy without commensurate gains, but extends an invitation for further encroachment on the free-market philosophy that the antitrust laws subserve.

"We therefore recommend Congressional repeal both of the Miller-Tydings amendment to the Sherman Act and the McGuire amendment to the Federal Trade Commission Act, thereby subjecting resale-price maintenance, as other price-fixing practices, to those Federal antitrust controls which safeguard the public by keeping the channels of distribution free."

criterion which determines in each particular case whether the conduct is actionable. One having no business interests to serve may not induce a breach of business relations. Such inducement is in law regarded as wanton and malicious. One having business interests to serve may by every fair means, such as lowering prices, offering better service, showing better salesmanship, freely induce those not under fixed contract to become his customers. Here the interest of the public in preserving free competition overbalances the public interest in protecting the individual in the business relations he has built up. This same principle of justification, though in narrower limits when business relations are cast in contract form, operates within those limits as strongly to make conduct nonactionable as it does in business relations not fixed by contract. It would be difficult to imagine a plainer case of justification for interference than the case made out here."

Padgitt v. Lone Star Gas Co., Tex.Civ. App., 213 S.W.2d 133, at page 138 thus speaks to the same effect:

"Lastly and in final analysis, the claim of unfair competition is based on sales by defendant of butane at a price less than appellants are able or willing to sell it to their customers. Legitimate price-cutting is of the essence of a free competition; being an all too infrequent phase of present day economics, under which commodity prices appear to have no direction except 'up.' ' * * * One having business interests to serve may by every fair means, such as lowering prices, offering better

service, showing better salesmanship, freely induce those not under fixed contract to become his customers. * * *' Fairbanks, Morse & Co. v. Texas Electric Service Co., supra. 'If, for instance, the appellees, in the transaction of the business of lending in competition with appellants, had offered money for loan at a rate below that which the appellants could furnish it, and thereby induced the customers of the appellants to borrow from the defendant company, and by reason thereof Brown Bros. were unable to maintain their business, and were broken up and compelled to quit, then no cause of action would exist in favor of the appellants against the defendants, because, however malicious the motive, the means used would be lawful. * * *' Brown v. American Freehold Land Mortgage Co., etc. 97 Tex. 599, 80 S.W. 985, 987, 67 L.R.A. 195."

Upon the authority of these cases, the principles they announce and apply, I am of the clear opinion that no cause of action is alleged against defendant and that the judgment should be affirmed.

RIVES, Circuit Judge (dissenting).

The majority concludes that " * * * the public policy established by the Florida Supreme Court is opposed to actions such as the present one * * *." With deference, I respectfully dissent.

In the first place, if the Florida Legislature has acted, and acted constitutionally, the public policy of the State is not left to be "established by the Florida Supreme Court." When, in 1949, the Florida Legislature enacted Section 541.-03(1) [1] of the Florida Statutes, F.S.A.,

---

1. " § 541.03. Contract may govern price of sale or resale.

"(1) No contract relating to the sale or resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which commodity is in free and open competition with commodities

of the same general class produced or distributed by others shall be deemed in violation of any law of the State of Florida by reason of any of the following provisions which may be contained in such contract:

"(a) That the buyer will not resell such commodity at less than the minimum price stipulated by the seller;

it left no possible doubt as to the public policy of that State excepting only the constitutionality of the statute.

My brothers state categorically that, "We do not find it necessary to decide that Fair Trade contracts are invalid in Florida even between the parties", and indeed they could not so decide without finding a State statute violative of the State Constitution in advance of such a holding by the State Supreme Court. The majority, nevertheless, clearly indicates its opinion that the Florida Supreme Court would hold the statute unconstitutional.[2] Unless and until the State Supreme Court has actually so held, it seems clear to me that the Act of the Legislature of Florida is entitled to complete respect in this Court, especially when as the majority concedes, "At the present time there seem no longer to be any federal constitutional or statutory barriers to Fair Trade Legislation."

The Florida Supreme Court has gone no further than to declare the *nonsigner clause* of a Fair Trade Act unconstitutional.[3] True, some of the Justices of that Court expressed in their opinions strong disapproval of the general economic soundness of Fair Trade legislation, but we do those Justices wrong if we assume that they will undertake to substitute their views of the economic wisdom of the Act for the views of the Florida Legislature to which the State Constitution has committed the duty and responsibility of acting upon such questions. I still entertain the view which I expressed for this Court in Schwegmann Bros. *Giant Super Markets v. Eli Lilly & Co.*, 5 Cir., 205 F.2d 788, 791, that "We have no judicial concern with the economic and social wisdom of any feature of the law, but solely with its constitutionality", and I think that that principle should hold true in our prediction of any future decision of the Florida Supreme Court.[4] Indeed, it seems

"(b) That the buyer will require of any dealer to whom he may resell such commodity an agreement that he will not, in turn, resell at less than the minimum price stipulated by the seller;

"(c) That the seller will not sell such commodity

"1. To any wholesaler, unless such wholesaler will agree not to resell the same to any retailer unless the retailer will in turn agree not to resell the same except to consumers for use and at not less than the stipulated minimum price, and such wholesaler will likewise agree not to resell the same to any other wholesaler unless such other wholesaler will make the same agreement with any wholesaler or retailer to whom he may resell; or

"2. To any retailer, unless the retailer will agree not to resell the same except to consumers for use and at not less than the stipulated minimum price."

2. "For it seems to us that the constitutional theories repeated in so many of its decisions would be more consistent with declaring the entire Act invalid. * * * We think it may well be that Fair Trade contracts are unenforceable in Florida even between the parties * * *."

3. Bristol-Myers Co. v. Webb's Cut-Rate Drug Co., 137 Fla. 508, 188 So. 91; Liquor Store, Inc., v. Continental Dis-

tilling Corporation, Fla., 40 So.2d 371; Seagram-Distillers Corp. v. Ben Greene, Inc., Fla., 54 So.2d 235; Miles Laboratories, Inc., v. Eckerd, Fla., 73 So.2d 680.

4. Actually, the Supreme Court of Florida has many times adhered to that principle. Scarborough v. Webb's Cut Rate Drug Co., 150 Fla. 754, 8 So.2d 913, holding that courts are not concerned with the policy of legislative acts. Accord: State ex rel. McMullen v. Johnson, 102 Fla. 19, 135 So. 816; Stewart v. De Land-Lake Helen Special Road & Bridge District in Volusia County, 71 Fla. 158, 71 So. 42; Lainhart v. Catts, 73 Fla. 735, 75 So. 47; Hunter v. Owens, 80 Fla. 812, 86 So. 839; See also, City of Hernando v. Robertson, 97 Fla. 1083, 125 So. 529, holding that if a statute does not violate federal or state Constitution, *policy* of legislature is not subject to judicial review. Courts may not strike down act because it does not square with court's view on public policy. State ex rel. Landis v. Dyer, 109 Fla. 33, 148 So. 201. Accord: State ex rel. Dowling v. Butts, 111 Fla. 630, 149 So. 746, 89 A.L.R. 946; L. Maxcy, Inc., v. Federal Land Bank of Columbia, 111 Fla. 116, 150 So. 248, affirmed 111 Fla. 116, 151 So. 276; Shelby v. City of Pensacola, 112 Fla. 584, 151 So. 53. Court is not concerned with wisdom, necessity, *or poli-*

to me, as I will presently explain, that the Justices of the Supreme Court of Florida have already indicated their adherence to that principle as applied to the particular statute under consideration.

In an able opinion granting a preliminary injunction, the Circuit Court of Dade County, Florida, held the Florida statute constitutional. Sunbeam Corporation v. Chase & Sherman, Inc., decided June 30, 1953. The Supreme Court of Florida, after hearing argument before the full Court en banc, denied certiorari without opinion. Chase & Sherman, Inc., v. Sunbeam Corporation, 73 So.2d 714. The briefs of counsel, otherwise excellent and full, give us little help on the effect of that denial of certiorari by the Florida Supreme Court, and my brothers quite naturally assume that, like denial of certiorari by the United States Supreme Court, it "carries no implication concerning the merits of the case," citing State of Maryland v. Baltimore Radio Show, 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562. Such research and information as has been available to me indicates that that assumption is not at all accurate, but that to the contrary the denial of certiorari in that case, even without opinion, had the effect of affirming the interlocutory decree of the Circuit Court. See Davis v. Strople, Fla.1949, 39 So.2d 468; Advertects, Inc., v. Sawyer Industries, Fla.1953, 64 So.2d 300. There are two interesting articles on the subject in Volume 4 of the University of Florida Law Review (1951) from each of which, due to the importance of the question in the present case, I quote rather full extracts in the footnote.[5] As those ar-

---

cy of laws, but is responsible only for their construction and interpretation. State ex rel. Richardson v. Ferrell, 130 Fla. 26, 177 So. 181. Accord: State ex rel. Hosack v. Yocum, 136 Fla. 246, 186 So. 448, 121 A.L.R. 270.

For more recent cases, see Rotwein v. Gersten, 160 Fla. 736, 36 So.2d 419, holding that *the Legislature is the policy making authority* and courts must heed its policy declarations, assuming the statute being construed was validly enacted. Accord: Ideal Farms Drainage Dist. v. Certain Lands, 154 Fla. 554, 19 So.2d 234; Saunders v. City of Jacksonville, 157 Fla. 253, 25 So.2d 655; Cf. Local No. 234 of United Association of Journeymen and Apprentices of Plumbing and Pipefitting Industry of United States and Canada v. Henley & Beckwith, Inc., Fla., 66 So.2d 818.

Finally, see a July, 1954 decision by Florida Supreme Court, Volusia County Kennel Club v. Haggard, 73 So.2d 884, certiorari denied sub nom., Lane v. Volusia County Kennel Club, 348 U.S. 865, 75 S.Ct. 87, holding that the wisdom of policy and motive and determination with reference to policy of legalizing gambling with relation to dog races is a legislative and not a judicial function.

5. "In summarizing certiorari in Florida one must at least recognize federal statutory certiorari, issued by the Supreme Court of the United States to state courts of last resort and the United States courts of appeal; it can always be requested, is granted some fifteen percent of the time, and nevertheless accounts for more reviews than does appeal, which is of right but strictly limited in availability and scope. Denial of a petition for certiorari is not an affirmance of the judgment below; it merely signifies that less than four members of the Supreme Court of the United States are persuaded that review is advisable.

"At the other extreme is certiorari under Rule 34 of the Rules of Practice of the Supreme Court of Florida, which is not certiorari at all but rather a sadly misnamed method of taking, on the equity side, ' * * * appeals from interlocutory decrees as authorized by statute including orders or decrees after final decree * * *.' It lies as of right; no writ actually issues; and denial of this 'certiorari' is a definite affirmance of the interlocutory decree under attack rather than a mere refusal to consider it." 4 University of Florida Law Review, pp. 447–448.

"Effect of Denial of Certiorari
Under Rule 34

"Authority need hardly be cited to the proposition that review of interlocutory orders under Rule 34 is not discretionary but a matter of right, and that Rule 34 merely provides a novel method of exercising the right.

"But the novelty of the method of such review, after having confused the bar and the legal editors, finally produced still further confusion in the bench. In Davis v. Strople the Supreme Court, in

ticles demonstrate, certiorari under Rule 34 of the Rules of Practice of the Supreme Court of Florida, 30 F.S.A., is available as a matter of right for the review of interlocutory orders or decrees in chancery, and differs markedly from common law certiorari. See Kilgore v. Bird, 149 Fla. 570, 6 So.2d 541, 544. Under the State practice, therefore, it seems to me the Florida Supreme Court has definitely recognized the validity of fair trade agreements as between the contracting parties.

On January 28, 1955, Judge Vincent C. Giblin of the Circuit Court of Dade County, Florida, in a memorandum opinion in Union Underwear Co., Inc. v. H. Rayvis et al., said:

" * * * the defendants A. Goldberg and Norman Morganstern knowingly induced the last mentioned retailers to violate their Fair Trade Agreement with plaintiff and sell them plaintiff's merchandise below the fair trade price with full knowledge of all of the circumstances and are now selling such merchandise at retail below the established price.

"I approve the plaintiff's theory as contained in the Amended Complaint that one who wrongfully induces the breach of a contract commits an actionable wrong that can be enjoined."

No appeal was taken from the permanent injunction entered in that case.

A ruling directly contrary to the holding of the majority was made by Chief Judge Holland of the Southern District of Florida on October 2, 1953, in Sunbeam Corporation v. Rotenberger, No. 5125, M.Civil.*

Even in the absence of the two decisions from the Circuit Court of Dade

---

a 5–1 decision held that an earlier decision in that case holding merely 'petition for certiorari denied' conclusively settled the law of the case on the point raised. The Court cited as authority Hunter v. Tyner [151 Fla. 707, 10 So. 2d 492] and Hager v. Butler [156 Fla. 113, 22 So.2d 631].

"The dissent in the Davis case argued that a denial of certiorari without opinion, in a prior interlocutory appeal should not be considered as an affirmance of the order reviewed, establishing the law of the case, but on the contrary should be considered merely the exercise of discretion not to consider the merits of the legal point raised, as is inherent in common law certiorari. The dissent urged, by way of analogy, the holdings of the United States Supreme Court as to the legal effect of 'certiorari denied' in review sought there.

"The practice of the United States Supreme Court in disposing of petitions for certiorari has recently been summarized in [State of] Maryland v. Baltimore Radio Show. An examination of this opinion will disclose that that practice has no remote analogy to that of the Supreme Court of Florida in deciding interlocutory appeals taken under Rule 34.

"When the United States Supreme Court is petitioned to grant certiorari, the only question presented and briefed is the question whether or not it will hear the case later on the merits. The grant-ing of certiorari is a discretionary decision to put the case on its docket, and thereafter, in due course, to hear it on the merits. The denial of certiorari is a discretionary decision to let the final judgment of the lower court stand.

"On the contrary, when an interlocutory order in equity is appealed to the Florida Supreme Court under Rule 34, the merits are presented by the petition and supporting brief, and controverted in the brief of respondent; the case is orally argued on the merits; and what the Court takes under consideration for determination is the merits of the order reviewed. No question is presented or considered as to whether or not the Court will later hear the merits; the Court actually hears the merits; and when it rules, of necessity it decides the merits.

"The distinction between the two types of certiorari is obvious. There is no analogy. But here's the rub. The fact that any justice of the Florida Supreme Court should think the federal practice bears the slightest resemblance to the Florida practice is, in and of itself, a condemnation of Rule 34 as a source of unjustifiable confusion resulting from the mere use of the word 'certiorari' in the rule."
4 University of Florida Law Review, pp. 529–531.

● Case pending.

County, of the denial of certiorari from one of those decisions by the Florida Supreme Court, and of Judge Holland's decision, and if the Florida Statute (Footnote 1) stood alone, that statute, together with the decisions of the Florida Supreme Court on the nonsigner clause (Footnote 3), seems to me to make the public policy of the State of Florida clear to the effect that while a nonsigner cannot be bound merely by notice of a contract to which he is not a party, a manufacturer can maintain the resale prices of his product by contract.

Appellee's brief describes this action as "an adroit effort to effectuate and enforce the nonsigner provision of the Florida Fair Trade Act which has been repeatedly held unconstitutional," and the majority of this Court sees "little merit in the attempted distinction relative to policy." The position of the majority may be sound if it is correct in assuming that the public policy of Florida is opposed to all fair trade contracts; on the other hand, it is not sound if, as its Legislature has enacted, Florida permits price maintenance by *contract.* (See Statute, Footnote 1, supra.)

In the forty-five fair trade states, appellant restricted the distribution and sale of its products to distributors and dealers who would voluntarily contract with it to maintain resale prices. As was aptly said by Judge Freeman of the United States District Court for the Eastern District of Michigan in the case of Sunbeam Corporation v. Economy Distributing Co., Inc., 131 F.Supp. 791, decided March 3, 1955:

> "Indeed, it is one thing to say that a manufacturer may not, by a single fair trade contract, fix the price of its products throughout the entire state even as to nonsigners; it is quite another to say that it may not accomplish this end by selling only to those willing to execute fair trade contracts."

The averments of the complaint went much further than simply alleging the selling of plaintiff's products at cut prices. In addition,[6] it alleged: (a) that defendant knew that plaintiff confined its sales to persons who contracted with it to maintain re-sale prices; and (b) that defendant intentionally induced some of such persons to violate their contracts with plaintiff.

The law of Florida seems clear to the effect that intentional and unjustifiable interference with contractual relations is actionable. Dade Enterprises, Inc., v. Wometco Theatres, Inc., 119 Fla. 70, 160 So. 209. In that case the Florida Supreme Court said:

> "And upon a like principle, it has been held that when owing to special features, a contract involves peculiar convenience or advantage, or where the loss occasioned by its breach would be a matter of uncertainty, so that the breach of such contract might be deemed to cause irreparable injury and subject to equitable enforcement, the threatened or

6. To quote some of the averments of paragraph 23 of the complaint:

"* * * The defendant, well knowing that plaintiff's dealers and distributors were bound by contract, as aforesaid, not to deal with any person who had not executed a contract, has by devious means, on information and belief, directly and indirectly, through its parent company and through agents, brokers, clandestine intermediaries, and diverse (sic) persons unknown to plaintiff, solicited, sought and succeeded either directly or indirectly, in inducing distributors and/or retailers in those states bound by Sunbeam fair trade contracts to supply and sell Sunbeam products to

the defendant in violation of such contracts, and, well knowing of plaintiff's contractual system of distribution aforesaid, has knowingly purchased and accepted delivery of products bearing plaintiff's trademark from persons not authorized by contract to engage in the business of handling or selling the same, well knowing that in so doing it would encourage dealers and distributors surreptitiously and clandestinely to violate their contracts and directly or indirectly sell such products to defendant thereby interfering with and depriving plaintiff of the benefits of its said fair trade contracts and contractual system of distribution."

impending tort of a third party who interferes with the performance of such contract, or consciously contributes to the impairment of the right of a party thereto to avail himself of its obligations, may be enjoined by the party whose enjoyment of existing contractual rights is thus endangered; the application of this doctrine being no longer restricted to contracts for personal services." 160 So. at page 210.

See also, Harvey Corp. v. Universal Equipment Co., 158 Fla. 644, 29 So.2d 700, 704. The authorities generally are well collected by Judge Oliver T. Carter of the Northern District of California in Sunbeam Corp. v. Payless Drug Stores, 113 F.Supp. 31, 36:

"The theory upon which the first claim for relief is based is the allegation that defendants have tortiously interfered with plaintiff's contractual relations. It is alleged that defendants have knowingly, wilfully and without justification induced breaches of plaintiff's contracts. That such conduct is actionable has long been well settled in law and equity in a long line of cases stemming from Lumley v. Gye, 2 E. & B. 216, and including, to cite but a few of the modern cases, Angle v. Chicago, St. Paul, Minneapolis & Omaha R. Co., 151 U.S. 1, 14 S.Ct. 240, 38 L.Ed. 55; Bitterman v. Louisville & Nashville R. Co., 207 U.S. 205, 28 S.Ct. 91, 52 L.Ed. 171; Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L.Ed. 131; American Malting Co. v. Keitel, 2 Cir., 209 F. 351; Falstaff Brewing Corp. v. Iowa Fruit & Produce Co., 8 Cir., 112 F.2d 101; Keene Lumber Co. v. Leventhal, 1 Cir., 165 F.2d 815; Baruch v. Beech Aircraft Corp., 10 Cir., 175 F.2d 1; Hope Basket Co. v. Product Advancement Corp., 6 Cir., 187 F.2d 1008; Gruen Watch Co. v. Artists Alliance, 9 Cir., 191 F.2d 700; Philadelphia Record Co. v. Leopold, D.C.S.D.N.Y., 40 F.Supp. 346; Imperial Ice Co. v. Rossier, 18 Cal.2d 33, 112 P.2d 631; California Grape Control Board, Ltd. v. California Produce Corp., 4 Cal.App.2d 242, 40 P.2d 846; cases collected in 84 A.L.R. 55; in Prosser on Torts (West Pub. Co., 1941) 976–1013; note in 24 Calif.L.Rev. 208. See also Sayre, 'Inducing Breach of Contract,' 36 Harv.L.Rev. 663; Carpenter, 'Interference with Contractual Relations,' 41 Harv.L.Rev. 728; Restatement of Torts, Section 766."

Nor can I see how the criterion of balancing of public interests espoused in the concurring opinion on the authority of Fairbanks, Morse & Co. v. Texas Electric Service Co., 5 Cir., 63 F.2d 702, and Padgitt v. Lone Star Gas Co., Tex.Civ.App., 213 S.W.2d 133, would justify the dismissal of the complaint in this case without a hearing. My consideration of that doctrine simply brings me back to the question of what is the public policy of the State of Florida. To me, there can be no better evidence of that public policy than the statute (Footnote 1, supra) never declared unconstitutional by the Florida Courts, and indeed consistently sustained by the lower courts and, I think, also by the Supreme Court of Florida.

Lastly, it seems to me that the present decision is not only contrary to the decision of Judge Holland within our Circuit, but is in conflict with the following Federal cases in other Circuits: Wells & Richardson Co. v. Abraham, C.C.E.D. N.Y., 146 F. 190, affirmed 2d Cir., 149 F. 408; Sunbeam Corporation v. Payless Drug Stores, D.C.N.D.Cal., 113 F. Supp. 31; Sunbeam Corporation v. Economy Distributing Co., Inc., D.C.E.D. Mich., 131 F.Supp. 791, decided March 3, 1955. So far as I have found, this is the first time that a manufacturer has been refused relief against tortious interference with valid price maintenance contracts on the ground of public policy. I, therefore, respectfully dissent.