**DON KING PRODUCTIONS, INC., Plaintiff,**

v.

**James "Buster" DOUGLAS, John P. Johnson, Golden Nugget, Inc., and the Mirage Casino–Hotel, Defendants.**

**No. 90 Civ. 1203 (RWS).**

United States District Court, S.D. New York.

July 2, 1990.

Sidley & Austin, New York City (Robert W. Hirth, of counsel), for plaintiff.

Hunterton & Naylor, P.C., Las Vegas, Nev. (C. Stanley Hunterton, of counsel), for defendant James "Buster" Douglas and John P. Johnson.

Warshaw Burstein Cohen Schlesinger & Kuh, New York City (Robert Fryd, of counsel), for defendants The Mirage Casino–Hotel and Golden Nugget, Inc.

## OPINION

SWEET, District Judge.

Defendants Mirage Casino–Hotel and Golden Nugget, Inc. (together "Mirage"), James "Buster" Douglas ("Douglas") and John Johnson ("Johnson") have moved pur-

suant to Rule 3(j) of the Local Civil Rules of the United States District Court, Southern District of New York, for reargument of the opinion of the court dated May 18, 1990, 742 F.Supp. 741 (S.D.N.Y.1990) denying summary judgment to all parties (the "May 18 Opinion"). The motion for reargument has been granted, argument was heard on June 1, 1990, and upon such consideration, the prior rulings of the court set forth in the May 18 Opinion are left undisturbed.

*Prior Proceedings*

Facts and past proceedings relating to this action are fully set forth in the May 18 Opinion determining the parties' cross-motions for summary judgment, familiarity with which is assumed. By these motions, Douglas and Johnson reargue the choice-of-law determination therein that New York law governs the breach of contract claim. On the tortious interference claim Mirage also reargues the choice-of-law determination to the extent it requires application of New York law to assess the validity and legality of the contracts with which Mirage is alleged to have interfered.

*Law Governing the Breach of Contract Claim*

Douglas and Johnson urge that new evidence has come to light which, properly weighed under the correct legal standard, should alter the May 18 determination of choice-of-law. The new evidence [1], according to movants, shows that King signed the Promotional Agreement when in Nevada, was in Nevada at all relevant times during that Agreement's negotiation, and spent much time in Nevada during the term of the Promotional Agreement. The correct legal standard through which to filter these facts is no longer the one urged in the Douglas/Johnson opening memorandum in support of summary judgment ("New York courts apply a 'significant contacts' test," Memo. at 38), but rather, a strict "place of execution" test. Applying that test to the "new" facts, Nevada is said to supply the proper governing law.

---

**1.** In fact, the documentary materials in question were produced to movants on May 3, 1990, two    weeks prior to the May 18 Opinion.

The argument is unpersuasive for several reasons. First, in setting forth a different choice-of-law standard, Douglas/Johnson work from the false assumption that the Promotional Agreement does not contain a contractual choice-of-law provision, when concededly that Agreement does. Douglas/Johnson do not challenge, but simply choose to ignore, the appropriate standard in such an instance: "When such a provision exists and the jurisdiction chosen by the parties has a substantial relationship to the parties or their performance, New York law requires the court to honor the parties' choice insofar as matters of substance are concerned...." May 18 Opinion at 756 (quoting and citing controlling legal authorities).[2]

■ As further stated in the May 18 Opinion and unchallenged on reargument,

> such provisions are properly disregarded only when the parties' chosen local law lacks such a substantial relationship *and* another state, application of whose local law is urged upon the court, demonstrably has "the most significant contacts with the matter in dispute...."

May 18 Opinion at 756 (emphasis added; citations and footnote omitted). It is this standard therefore that must be applied to the facts, including any new ones adduced on reargument. The new facts neither show that New York lacks a substantial relationship to the parties or the transaction nor that Nevada has the most significant contacts with the parties to and subject matter of the Promotional Agreement.

As observed in the prior opinion, none of the contract parties is a citizen of Nevada (Douglas and Johnson are from Ohio), nor does any make Nevada its principal place of business.[3] The new factual contention that of 332 weekdays between January 1, 1989 and April 23, 1990, King spent 51 days in New York, 64 days in Nevada, and 51 days in Ohio—if, as urged, it bears on the locus of King's performance under the Promotional Agreement—is more probative of the legal proposition set forth in footnote 18 of the May 18 Opinion, reiterated here in the margin, than it is of the Johnson/Douglas claim that these facts dictate that Nevada law apply:

> "[T]he place of performance can bear little weight in the choice of the applicable law when ... performance by a party is to be divided more or less equally among two or more states with different local law rules on the particular issue."

Opinion at 757 n. 18 (quoting Restatement (Second) § 188 comment e at 580). The appropriateness of that conclusion is particularly evident in the context of a dispute over a contract which the parties themselves determined should be governed by a particular local law, rather than leaving its determination subject to manipulable and remote factors such as the number of days a person spends in a variety of jurisdictions.

What remains is the Johnson/Douglas assertion that the Promotional Agreement was negotiated "at all relevant times" in Nevada and was executed by King in Nevada. The former claim contradicts sworn

---

**2.** Douglas/Johnson concede that the New York court cases they cite in support of their "place of execution" standard are relevant only "absent a contractual choice-of-law provision." Memo on Reargument at 10. Yet Douglas and Johnson do not address in any new fashion the existence and significance of the choice-of-law provision in the Promotional Agreement, merely reiterating in the motion papers their prior argument that the clause was contained in all of King's contracts. That point is unpersuasive in light of the testimony of Stephen Enz, the Douglas/Johnson attorney who negotiated the Promotional Agreement:

> ... Mr. King sent me DKP's standard form of promotion agreement. However, several of the provisions of the proposed agreement

were unacceptable to me. Accordingly, I redrafted the agreement with the changes that I required on behalf of my clients, had it retyped in my office, and sent the proposed form of agreement to Mr. King....

Enz Affidavit, ¶ 3. Thus, there is no question of fact raised that the choice-of-law provision was unaccepted by or unacceptable to Douglas/Johnson.

**3.** May 18 Opinion at 757. The Nevada federal district court previously determined that DKP's principal place of business is New York, where its central offices are located and the company is incorporated, not Nevada. *See Douglas v. Don King Productions, Inc.,* 736 F.Supp. 223, (D.Nev.1990) Transcript of Hearing of March 19, 1990.

affidavits and exhibits of Johnson and the Johnson/Douglas attorney, Stephen Enz, who negotiated the Agreement, which were submitted in support of the summary judgment motion. These sources indicate that King was present in California for at least certain of the telephone negotiations of the Agreement and that prior entreaties by Enz to negotiate such contract were sent to DKP in New York. *See* Johnson Affidavit, ¶ 5 ("the negotiations were conducted primarily over the telephone, when Mr. Enz was in Ohio and Mr. King (on behalf of DKP) was in California."); Enz Affidavit, ¶ 3 (indicating, *inter alia*, that King called Enz from Los Angeles, California to negotiate contract, following several letters sent by Enz to DKP and prior discussions at unspecified locations between King and Johnson); Exhibit 43 (letter to DKP's office in New York offering to "entertain negotiations" to execute new promotion agreement). There is no question that Johnson and Douglas, and their attorney, Enz, were in Ohio, not Nevada, at the time of the negotiations. Thus, there appears to no reason to modify the statement in the May 18 Opinion, at 756–57, that the "contract was negotiated in several states, including New York, Ohio, California and Nevada...."

That leaves the contention that King at least executed the contract in Nevada. For the reasons previously stated and in reliance on authorities cited in the May 18 Opinion, at 756–57 n. 17, that fact does not establish that Nevada is the jurisdiction with the most significant contacts with the Promotional Agreement, as required by the applicable legal standard, nor even that the Agreement was in fact "made" in Nevada. Even according to the Johnson/Douglas version of events, King's signing then and there did not conclude the Agreement, since King had made handwritten modifica-

tions to it. Owing to those modifications, their acceptance by Johnson and Douglas (who were in Ohio) became the last act necessary to make the Agreement binding and enforceable. That occurred when Johnson and Douglas initialed the modifications. Thus, the Agreement, fortuitously, was "made" in Ohio.[4]

The fact that an initialed copy of it was subsequently mailed to King at the hotel he was then staying at in Nevada hardly alters that outcome, since return receipt—at that or any other location—was not made a condition of the Agreement's becoming final and enforceable. The offeror (or counter-offeror) is "master of his offer" and may therefore make its acceptance (and thereby, the parties' final agreement) conditional upon return or receipt of the signed contract, *see e.g., Willison on Contracts,* § 88 (3d ed. 1957). Here, however, DKP as offeror did not do so. To the contrary, DKP, in transmitting the signed and modified Agreement to Johnson/Douglas, stated only that release of certain funds held in escrow would need await delivery to DKP of the Agreement (at no particular location). *See* Transmittal Letter to Enz from Hirth ("This *payment* is, of course, contingent upon—and should be held in escrow until—your clients initial the changes and deliver the executed Agreement.") (emphasis supplied).

Thus, the language chosen by the offeror conditioned payment—not the distinct legal event of acceptance of the Agreement—upon delivery. The cases cited by Douglas and Johnson on this point are in that respect distinguishable. *See Chesapeake Supply and Equipment Co. v. J.I. Case Co.,* 700 F.Supp. 1415 (E.D.Va.1988) ("explicit terms of the Agreement ... pro-

**4.** Had delivery been made an explicit condition of the contract's creation, the place of making of the contract would, just as fortuitously, have been Nevada, simply because the contract was sent to King's hotel room there rather than to *some other equally unspecified location* such as the DKP office in New York or to DKP's counsel's office in Chicago, both locations at which Enz had previously directed legal correspondence. All of this only serves to emphasize how such relatively remote and technical considera-

tions as place of delivery—although of some use when more telling contacts are unavailable—are of pale significance when the parties to a negotiated contract themselves have agreed upon the applicable law (provided the chosen law bears some reasonable relationship to them). *See* May 18 Opinion at 757 n. 17 (quoting Restatement (Second) of Conflict of Laws § 188 comment e to the effect that fortuitous contacts are entitled to little weight).

vide[d] that 'this Agreement shall become *effective* as of 7–5, 1978, provided it has been fully executed by the parties and a copy so executed has been delivered to Dealer.' ") (emphasis added); *Krofft Entertainment, Inc. v. CBS Songs,* 653 F.Supp. 1530, 1532 (S.D.N.Y.1987) (genuine issue of fact where transmittal letter requesting execution and delivery of contract to other party if *"acceptable* to you") (emphasis added). Here there is no genuine factual dispute that by their own terms, neither the Agreement or transmittal letter placed such a delivery condition upon acceptance by Johnson and Douglas.

Accordingly, for these reasons, there is no basis for altering the conclusions set forth in the May 18 Opinion, at 33, that "the parties' chosen governing law be honored" in considering issues bearing on the Promotional Agreement. As the motion for reargument by Johnson/Douglas does not bring to bear any new considerations with respect to the Bout Agreement, which concededly was neither negotiated nor executed in Nevada, there is no cause for reconsideration of the prior determination governing that Agreement. *See* May 18 Opinion at 758–59.

*Law Governing the Tortious Interference Claim*

■ The May 18 Opinion ruled that whether Nevada or New York law governed the general contours of the tortious interference claim, under New York choice-of-law rules New York law should continue to govern determination of the contract validity issue that is a component of that claim. Opinion at 771–72 n. 30. Mirage argues the court overlooked two decisions, *Sunbeam Corp. v. Masters of Miami, Inc.,* 225 F.2d 191 (5th Cir.1955) ("*Sunbeam* "), and *Barnes Group, Inc. v. C & C Products, Inc.,* 716 F.2d 1023 (4th Cir.1983) ("*Barnes* "), application of which would require that Nevada law govern the issue of contract validity.

Neither decision is "controlling authority" favoring that proposition (as required by Rule 3(j)); indeed, neither case addresses or construes New York choice-of-law rules, which the court relied upon in its

May 18 determination and which under *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941), must of course steer a diversity court sitting in New York. In any event, review of the cited authorities fails to establish Mirage's position.

The *Sunbeam* case presented for decision whether a tortious interference claim based upon an out-of-state contract between non-Florida residents—but brought in a diversity court in Florida—could survive a motion to dismiss premised on the Florida forum state's antipathy to the cause of action. The Fifth Circuit panel applied to these facts the "settled law that no foreign tort action contrary to a strong public policy of the forum state" can be maintained in the forum state. *Sunbeam,* 225 F.2d at 198 (citing Restatement, Conflict of Laws § 612 and 11 Am.Jur. "Conflict of Laws" § 183). It therefore affirmed the Florida district court's dismissal of the tortious interference suit, explaining that "the public policy established by the Florida Supreme Court is opposed to actions such as the present one" and that the "Full Faith and Credit clause does not require Florida courts to enforce such a foreign cause of action." *Id.*

The same principle is recognized under New York law. *See, e.g., Recovery Consultants, Inc. v. Shih-hsieh,* 141 A.D.2d 272, 534 N.Y.S.2d 374, 375 (1st Dept.1988) (noting well established exception to ordinary presumption of judicial enforcement of foreign agreement where to do so "would contravene the public policy of the forum") (citing additional New York cases); *Republic of Iraq v. First Nat'l City Bank,* 241 F.Supp. 567, 575 (S.D.N.Y.) (New York courts will not maintain cause of action contrary to fundamental New York public policy), *aff'd,* 353 F.2d 47 (2d Cir.1965), *cert. denied,* 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966). Mirage, however, does not contend that the forum state in this suit—New York—has a "public policy opposed to actions such as the present one." Since it was the Florida forum state's hostility to the type of contract in issue that

served as the *ratio decidendi* in *Sunbeam*, and no such forum state hostility to the contracts in this litigation is urged here, the *Sunbeam* case and the legal principle it stands for simply do not serve Mirage's interests.[5]

*Barnes Group, Inc. v. C & C Products, Inc.*, 716 F.2d 1023 (4th Cir.1983), also provides no basis for disturbing the May 18 Opinion's tortious interference choice-of-law rulings. In fact, *Barnes* squarely supports the *depecage* technique employed in the May 18 Opinion to analyze the tortious interference claim, namely, making one choice-of-law determination with respect to the contract validity/illegality element of the claim and a separate one for the remaining elements of the tort. *See* May 18 Opinion at 771 n. 30 (noting "claim of tortious interference with contract appears to be the sort of 'mixed' claim that might call for exercise of depecage").

*Barnes* addressed, on appeal, tortious interference claims brought with respect to each of several sales agency contracts between an Ohio metal parts division of a Delaware company and company salespersons resident in four separate states. Applying the original Ohio forum's choice-of-law rules to the tortious interference claims, the Fourth Circuit endorsed the two-step analysis followed by this court under New York choice-of-law rules. With the understanding that "a necessary element of the tort of intentional interference with contract is that the contract at issue be valid and enforceable as between the parties to it," *Barnes*

> address[ed] first the question of the law that properly should govern a threshold determination of whether the restrictive covenants at issue are enforceable between the parties, and then turn[ed] to consider the law that should govern questions of tort liability for interference with the contracts found enforceable.

716 F.2d at 1027.

The former task—determining which state's law should govern the issue of contract enforceability—parallels the analysis set forth in the May 18 Opinion at 755–60, which concluded that New York law governed the issues of validity and enforceability of the Agreements entered into between DKP and Johnson/Douglas. *Cf. Barnes*, 716 F.2d at 1027–1032.[6] As a second step, the *Barnes* court then examined which state's law should govern the other "tort" aspects of the causes of action for tortious interference. That analysis, *id.* at 1032–1033, mirrors the task set out in the May 18 Opinion at 771 n. 30.

In *Barnes*, little weight was assigned to this latter determination because in all but one instance, the jurisdictions involved recognized "a classic common law cause of

---

**5.** Similarly, the Mirage's reliance on Restatement (Second) Torts § 774 ("Agreement Illegal or Contrary to Public Policy") is unavailing. That section, which is a part of a restatement of substantive tort law, not surprisingly provides no instruction as to *which* state's law or public policy is to be consulted to determine an agreement's validity or illegality, the answer to which requires an *anterior choice-of-law determination*. Here, § 774 aids Mirage only to the extent that Mirage maintains that the Promotion Agreement is illegal under the law, or contrary to the public policy, of New York. That is because New York is the state that previously was held to be "the jurisdiction which has the greatest concern with, or interest in, the specific issue" of contract validity under *Neumeier v. Kuehner*, 31 N.Y.2d 121, 123, 335 N.Y.S.2d 64, 69, 286 N.E.2d 454, 457 (1972). May 18 Opinion at 771 n. 30. Notably, the correctness of that application of *Neumeier*'s interest analysis to the issue of the illegality/validity of the contractual element of a tort has neither been squarely addressed nor challenged by Mirage in its motion for reargument.

**6.** Under the distinct facts of *Barnes*, the court's execution of the first step resulted in a finding that the choice-of-law clause should (in one out of four of the contractual scenarios) be disregarded in favor of another state's conflicting law, in the instance of salesmen who resided in—and were intended to perform their contracted-for services principally in—Alabama, a state that disapproved of restrictive covenants as void as against public policy. *Barnes*, 716 F.2d at 1030, 1032. Assuming *arguendo* that Nevada fundamentally disapproves of exclusive promotional contracts, the analogous situation here would arise only if Douglas were a Nevada (rather than Ohio) citizen and the contract with DKP had expressly called for Douglas to perform in Nevada. Neither of those distinctive factors warranting abrogation of the parties' own choice-of-law is present here, as previously discussed in the May 18 Opinion (at 759–60).

action for tortious interference with contract," *Barnes* at 1033 & n. 27, and significant differences amongst the various jurisdictions' laws respecting the distinct issue of the enforceability of the restrictive covenants in the underlying contracts had been sorted out in the first stage of analysis. *Id.* at n. 27.[7]

The single, but major, exception to jurisdictional uniformity on the contours of the tort was Louisiana, a state that did not recognize *any* cause of action for tortious interference with contract. *Barnes,* 716 F.2d at 1033. Since Louisiana also had more significant contacts to the tort claim involving its resident salesmen than did Ohio, under the governing choice-of-law rules Louisiana law was held to govern the general contours of the tort (although not the contract validity issue). *Id.* No such cause of action there existing, the claim for interference with the contracts with Louisiana salesmen was ordered dismissed. That determination by the Fourth Circuit had nothing to do with the validity or enforceability of the contracts in Louisiana, as evident from the fact that the separate choice-of-law inquiry on that issue had resulted in a finding that the parties' contractual choice of Ohio law governed that question. *Id.* at 1032.

*Barnes* therefore is actually directly contrary to Mirage's position that regardless of whether New York law is applied to the contract claim, Nevada law should govern construction of the Agreements' validity and illegality for the tort claim. The case would be helpful to Mirage only if Nevada law recognized no tort of intentional interference with contractual relations or there was some material difference in the contours of the tortious interference causes of action as developed by the courts of New York and Nevada. No such difference has been brought to the attention of the court. Indeed, Mirage has relied upon authorities

construing New York law of tortious interference when it has thought such to be to its benefit in advancing its summary judgment motion.

Accordingly, supported by the additional authority of *Barnes,* the prior ruling of the May 18 Opinion stands that the law governing all issues of contract validity, legality and enforceability for purposes of the tortious interference claim should be that of New York, as determined by application of New York's contractual choice-of-law rules.

*Conclusion*

The motion for reargument has been granted and, upon such reargument, the relief requested by Mirage, Douglas and Johnson is deemed denied for the reasons stated above.

It is so ordered.

---

7. That result closely resembles the prior determination in this proceeding. *Cf.* May 18 Opinion at 771 & n. 30 (as "elements of a claim for tortious interference are essentially the same under New York law and Nevada law," it was "unnecessary to consider at length" under New York tort choice-of-law rules which state's law

governs tortious interference claim generally, but for reasons previously set forth under contractual choice-of-law portion of Opinion and under *Neumeier* interest analysis, contract validity element·of tort claim remains governed by prior contractual choice-of-law determination).